DAVIS v. GRAY.

1 In this case—where a person who had been appointed receiver of a railroad, to which a large grant of lands had been made by a State, was seeking to enjoin the officers of the State which had declared the lands forfeited, from granting them to other persons—the court states at large what is the office and what are the duties of a receiver, giving to them a liberal interpretation in aid of the jurisdiction of the court. It says that in the progress and growth of equity jurisdiction it has become usual to clothe them with much larger powers than were formerly conferred; that in some of the States they are by statute charged with the duty of settling the affairs of certain corporations when insolvent, and are authorized expressly to sue in their own names; and that the court sees no reason why a court of equity, in the exercise of its undoubted authority, may not accomplish all the best results intended to be secured by such legislation, without its aid

2. The doctrines of *Osborne* v. *The Bank of the United States* affirmed; and the principles re-declared.

(a.) That a Circuit Court of the United States, in a proper case in equity, may enjoin a State officer from executing a State law in conflict with the Constitution or a statute of the United States, when such execution will violate the rights of the complainant.

(b) That where the State is concerned the State should be made a party, if it can be done. That it cannot be done is a sufficient reason for the omission to do it, and the case may proceed to decree against her officers in all respects as if she were a party to the record.

(c.) That in deciding who are parties to the suit the court will not look beyond the record. That making a State officer a party does not make the State a party, although her law may prompt his action, and

she may stand behind him as the real party in interest; that a State can be made a party only by shaping the bill expressly with that view, as where individuals or corporations are intended to be put in that relation to the case.

3  The Memphis, El Paso, and Pacific Railroad Company had not (on the 20th of January, 1871), in view of the existence of the rebellion, and of several statutes of Texas condoning its non-compliance with conditions of its charter, lost its franchise or its right of and to the land grant and land reservation of the company given in its charter.

4.  The articles 5 and 7 of the constitution of Texas, made in 1869, which on an assumption that the company had then lost them, disposed of the lands away from it, violated the obligations of a contract and were void.

5.  Where the State of Texas had made to a railroad company a large grant of lands, defeasible if certain things were not done within a certain time by the company, the fact that the so-called secession of the State and her plunging into the war, and prosecuting it, rendered it impossible for the company to fulfil the conditions, in law abrogated them.

6.  However, as the court thought that the enforcement of the legal rule in the particular case would work injustice, it declined to apply such legal rule, and applying an equitable one held that the conditions should still be complied with; but complied with in such reasonable time, as would put the parties in the same situation, as near as might be, as if no breach of condition had occurred.

APPEAL from the Circuit Court for the Western District of Texas; the case being thus:

The State of Texas had at the times hereinafter named, certain public lands. A general land office was established at the capital of the State for the registration of titles and surveys, and the lands were divided when surveyed into sections of six hundred and forty acres each. One Kuechler was the chief of this office, under the title of the "Commissioner of the General Land Office." All certificates for the public lands were issued by this commissioner; and all patents were issued under the seals of the State and the General Land Office, and were required to be signed by the governor and countersigned by the said commissioner. These certificates were evidences of obligation on the part of the State to grant, and give a patent to the holder for a certain amount therein mentioned of the vacant and unreserved public lands of the State; when the certificates are located and surveyed, and the surveys returned to the commissioner

and approved by him, a patent, conveying the fee, is exe-
cuted as above mentioned.

In and about the year 1856, and for many years thereafter
the State of Texas, though of great extent, was, as it still is,
sparsely inhabited, while its public domain was far from
markets, and without connection with the more settled parts
of the country; and it was greatly to the interest of the
State to attract immigration and capital.  To produce this
result it became the settled policy of the State to make
grants and reservations of public lands to corporations, con-
ditioned upon the construction of certain amounts of rail-
road within certain times.  In pursuance of this policy the
Memphis, El Paso, and Pacific Railroad Company, was in-
corporated February 4th, 1856, by the State of Texas, to
build a railroad across the State from the eastern boundary
to El Paso, with a land grant of 16 sections to the mile; cer-
tificates for 8 sections per mile to be issued on the grading
of successive lengths of road, and 8 more per mile upon the
complete construction of the same; and a reservation was
granted of the alternate or odd sections of land for eight
miles on each side of the road, within which the company
should have an exclusive right to locate its certificates, while
it also had the privilege to locate said certificates on any
other unappropriated public lands.

This reservation, of course, was of the greatest value, as
it enabled the company to reap the advantage of the en-
hancement of price which the construction of the road by
them would cause in the lands along the line.

In the same year of 1856 the company was organized in
reliance on the grants, and especially on the reservation, and
duly accepted the same.

There were certain conditions *precedent* to the vesting of
the charter, land grant, and reservation; but they were all
complied with, and at a cost to the company for surveys of
over $100,000.  These and subsequent surveys resulted, for
the company, in the official designation of the road line and
the centre line of the reservation for some 800 miles, and
the "sectionizing" and numbering of the odd sections of

land in said reservation in a belt of country some 250 miles in length and 16 in width; and for the State in the surveying and mapping of the same belt of country and the "sectionizing" and numbering of the alternate or even sections for the benefit of the State. The company also graded some 65 miles of road westerly from Moore's Landing, in Bowie County, and was interrupted in the work of construction by the rebellion and so-called "secession" of Texas; but resumed work after the war, and graded between 20 and 30 miles further, from Jefferson in Marion County, in the direction of Moore's Landing.

There were certain conditions *subsequent* annexed to the charter, viz.: that if the company should not have completely graded not less than 50 miles of their road by the 1st of March, 1861, and at least 50 miles additional thereto within two years thereafter, then the charter of said company should be null and void. The first 50 miles were graded within the required time; the second 50 miles have never been graded. Within two years after the performance of the first condition, however, the legislature of Texas, by act " for the relief of railroad companies," approved February 11th, 1862, enacted, that the failure of any chartered railroad company to complete any section, or fraction of a section, of its road as required by existing laws, should not operate as a forfeiture of its charter, or of the lands to which the said company would be entitled under the provisions of an act entitled "An act to encourage the construction of railroads in Texas by donation of land," approved January 30th, 1854; provided that the said company should complete such section, or fraction of a section, as would entitle it to donations of land, under existing laws, within two years after the close of the war between the Confederate States and the United States of America. Within the two years after the close of the war, the provisional legislature, by act of November 13th, 1866, enacted, " that the grant of 16 sections of land to the mile to railroad companies heretofore or hereafter constructing railroads in Texas shall be extended, under the same restrictions and limita-

tions heretofore provided by law, for 10 years after the passage of this act;" and by article 12, section 33 of the present constitution of Texas, while declaring that the legislatures which sat from March 18th, 1861, to August 6th, 1866, were without constitutional authority, yet enacted that such declaration should not affect, prejudicially, private rights which had grown up under such acts, and that though the legislature of 1866 was only provisional, its acts were to be respected, so far as they were not in violation of the Constitution and laws of the United States.

By act of July 27th, 1870, the Southern Transcontinental Railroad Company was incorporated, and it was enacted, in terms, that it might "purchase the rights, franchises, and property of the Memphis, El Paso, and Pacific Railroad Company, heretofore incorporated by the State."

The land grant was limited to fifteen years from the 4th of February, 1856, but this time had not yet expired, and by an act of November 13th, 1866, for the benefit of railroad companies, it was enacted, that this grant of 16 sections of land to the mile to railroads theretofore or thereafter constructing railroads in Texas, should be extended under the same restrictions and limitations theretofore provided by law, for ten years after the passage of this act.

The land reservation was conditioned upon certain surveys: 1. It was to be surveyed from the eastern boundary of Texas, as far as the Brazos River, within four years from March 1st, 1856. 2. The centre line of the reserve was to be run and plainly designated from the Brazos to the Colorado within fifteen months from February 10th, 1858. 3. The whole reservation was to be surveyed within ten years from February 10th, 1858. 4. The company was to have a connection with some road leading to the Mississippi River or the Gulf of Mexico, within ten years from February 10th, 1858. The first and second of these conditions were fulfilled within the times limited. The legislature, by act approved January 11th, 1862, enacted that "the time of the continuance of the present war between the Confederate States and the United States of America shall not be com-

puted against any internal improvement company in reckoning the period allowed them in their charters, by any law, general or special, for the completion of any work contracted by them to do."

This act the company considered extended the time for the performance of the third and fourth conditions till the 10th of June, 1873.

In the years 1867 and 1868 the company executed two series of bonds, known as land grant bonds, amounting in the aggregate to the par value of $10,000,000 in gold, and also executed and delivered to one Forbes and others, trustees as aforesaid, two mortgages to secure said bonds, by one of which they mortgaged all lands actually acquired or thereafter to be acquired by said company by grading, constructing, and equipping the first 150 miles of the road of said company, from Jefferson in Marion County to Paris in Lamar County, and by the other of which they mortgaged the like property for the second 150 miles, from Paris to Palo Pinto in Palo Pinto County. These bonds were put on the bourse in Paris, France, and sold for value to the extent of $5,343,700 of their par value, mostly in small lots, and to persons of limited means. The grants, guarantees, and assurances by the State of Texas to said company of the said franchises, and especially of said land grant and land reservation, were recited in said mortgages, and were also announced and repeated to the purchasers personally, and by advertisement and prospectus, and the purchasers took the bonds relying on said grants, and upon the exclusive right of the company to locate certificates within the territory so reserved.

The bonds not being paid the Circuit Court for the Western District of Texas, on motion of Forbes, trustee under the mortgage, on the 6th of July, 1870, enjoined the railroad company from disposing of any of its effects, and put the road into the hands of one John A. C. Gray, as receiver:

"To take possession of the moneys and assets, real and personal; roadbed, road, and all property, whatsoever, of the said Memphis, El Paso, and Pacific Railroad Company, wheresoever

the same may be found, with power under the special order of the court, from time to time to be made, to manage, control, and exercise all the franchises, whatsoever, of said company, and, if need be, under the direction of the court, to sell, transfer, and convey the road, roadbed, and other property of said company, as an entire thing," &c.

On the 20th of January, 1871, it was further ordered by the court:

"That the said John A. C. Gray, receiver, as aforesaid, be, and he is hereby, authorized and empowered to defend and continue all suits brought by or against the said Memphis, El Paso, and Pacific Railroad Company, whether before or after the appointment of said receiver, and whether in the name of said company or otherwise; defend all suits brought against him as such receiver or affecting his receivership, and to bring such suits *in the name of said company, or in the name of said receiver*, as he may be advised by counsel to be necessary and proper in the discharge of the duties of his office, and for acquiring, securing, and protecting the assets, franchises, and rights of the said company and of the said receiver, and for securing and protecting the land grant and land reservation of the said company."

In November, 1869, the present constitution of Texas was adopted, and was approved by Congress. The fifth and sixth sections of this constitution are as follows.:

"SECTION 5. All public lands heretofore reserved for the benefit of railroads or railway companies shall hereafter be subject to location and survey by any genuine land certificates.

"SECTION 7. All lands granted to railway companies which have not been alienated by said companies in conformity with the terms of their charter respectively and the laws of the State under which the grants were made, are hereby declared *forfeited* to the State for the benefit of the school fund."

The constitutional convention which framed this constitution passed an ordinance to the effect that all heads of families actually settled on vacant lands lying within the Memphis and El Paso railroad reserve, shall be entitled to and receive from the State of Texas 80 acres of land, in-

cluding the place occupied, on payment of all expenses of survey and patent; and that all vacant lands lying within said reserve are declared open and subject to sale to heads of families actually settled on or who may actually settle on said reserve, at the price of one dollar per acre; and that said vacant lands within said reserve shall be open to preemption settlers, and subject to the location of all genuine land certificates.

There were in 1869, and were on the 20th of January, 1871, when Gray was ordered by the court to bring such suits in the name of the company as he might be advised by counsel were necessary and proper in the discharge of the duties of his office, a great number of land certificates outstanding and unlocated in Texas. Since the passing of the said ordinance, and the adoption of the said constitution, many hundreds of the holders of certificates other than those issued to the company had located their certificates on the sections reserved to the company, had returned their surveys and locations to the Commissioner of the General Land Office, and had applied for patents on the same. Before the 19th day of September, 1870, Commissioner Kuechler and Governor Davis, professing to act under the said constitutional provisions, issued 2 of such patents. On the 19th of September, 1870, the receiver filed a protest with the commissioner against issuing any further patents for lands reserved to the company, but the commissioner and governor disregarded the protest and issued 32 additional patents within the reserve; the whole of the land thus patented amounting to nearly 20,000 acres.

Hereupon on the same 20th of January, 1871, Gray, who was a citizen of New York, filed a bill in the court below against one Davis, governor of the State of Texas, and Keuchler, already mentioned as commissioner of the land office of the State. The bill—averring that "the Memphis, El Paso, and Pacific Railroad Company" is "a corporation created by and existing under certain statutes of Texas," already referred to, and that it had done "all acts and things necessary to the full and complete vesting, secur-

ing, and preserving of the franchises, rights, and privileges granted thereby"—set forth a history much as above given. It averred that the company was insolvent, and could not continue the construction of the road, and that the holders of said bonds would necessarily be remitted to the security of the mortgages; that the said security was worthless unless the receiver, under order of court, should be able to sell the franchises and property of said company to some party or parties who, by constructing the road, should acquire the lands referred to in the mortgages, and hold the same subject to the lien of them. It set forth that the general laws of Texas authorized to the fullest extent the conveyance of the franchises of a railway company by sale under execution or foreclosure; and that by act of July 27th, 1870, the Southern Transcontinental Railroad Company was created, and, as before mentioned, was expressly authorized by its charter to "purchase the rights, franchises, and property of the Memphis, El Paso, and Pacific Railroad Company, heretofore incorporated by the State;" that the Southern Transcontinental Company stood ready to do this, and to devote the lands to be acquired by the exercise of said Memphis and El Paso franchises to the settlement of the land grant mortgage debt, provided the receiver could convey the charter, the land grant, and the grant of the land reservation unimpaired and in full force.

It set forth further, that the receiver, on negotiating for a transfer of the franchises of the company, found that the market for them was peculiar, in the following respects: it was limited, as the franchises are only of use or value to those who desired and were able to construct the road; it depended in great measure upon the reputation of and confidence in the enterprise, and a belief among capitalists, outside of the State of Texas, that the State could and would have to abide by the grants contained in the charter; that it depended peculiarly and essentially upon the preservation of the land grant and land reservation, inasmuch as the country through which the road was to be built was sparsely inhabited, without cities or towns to furnish local traffic;

that Texas lands at a distance from railroads, were of but nominal value compared with lands along the line of the roads, and that the Southern Transcontinental Railroad Company, to whom the receiver chiefly looked as a purchaser, already had the right of way across the State and parallel with the route of the Memphis and El Paso charter, following "as near as might be practicable the old survey of the Memphis and El Paso road;" making the mere right of way of the latter of comparatively little value without the lands and the reservation.

It asserted that the acts of the governor and commissioner of the land office, in executing and causing to issue patents for the reserve, were, and their continuance would be, irretrievable destruction of that portion of the franchise of the company which consisted of the right to have the odd sections of the reservation devoted exclusively to the location and patenting of the company's certificates, would destroy all confidence in the other grants of the company, as well as in the grant of the reservation, and render the franchise of the company valueless in the hands of the receiver, doing irreparable injury to the interests committed to his charge.

It set forth further that the Southern Transcontinental Company asserted and insisted to the receiver, that unless the said acts were judicially declared unlawful, and perpetually restrained, the said franchises would be valueless to them, and that they would not carry out the purchase of the same.

[It was an admitted fact in the case, that the Memphis, El Paso, and Pacific Railroad Company had never sectionized or numbered the land reservation of the same west of Brazos River, or any portion of said reservation west of said river; and that no work had been done on the road of the said company before or since the year 1861, either by grading or otherwise, except those as already affirmatively stated and set forth.]

The bill further asserted that the charter of the company was a contract between the State and the company, which contract was now in the hands of the complainant as re-

ceiver, and under direction of a court of equity, to be used for the benefit of the creditors of the company; that the said provisions of the constitution of Texas and the said ordinance of convention impaired the obligation and value of the said contract, and also of the said contracts of mortgage, and were in so far contrary to article 1, section 10, of the Constitution of the United States, which declares that " no State shall pass any law impairing the obligation of contracts," and were in so far null and void; and that the acts of the governor of the State and commissioner of the land office, in issuing such patents, were without authority of law, and illegal, and that any repetition of the same should be perpetually restrained. The bill prayed an injunction accordingly.

As a reason for confining the bill to the two defendants named, an amendment to the bill alleged that the complainant had applied at the General Land Office of Texas, to have the number and names of the parties who had located land certificates other than those issued to the Memphis, El Paso, and Pacific Railroad Company, on lands within and forming a part of the land reservation of the said company, and to obtain a list of the same; that he had been informed, on making such application, and by the defendant, Kuechler, the Commissioner of the General Land Office, that the number of the same was very great, to wit, many hundreds, and that a list could not be furnished without great time and labor. The amendment further alleged that parties were constantly making locations and surveys of land certificates as aforesaid on the lands of said reservation; and that parties who had made such locations and surveys had —— months allowed them by law, after making the same, before they were required to make returns thereof to the Commissioner of the General Land Office, and that the complainant was consequently unable, and never would be able, to obtain a correct list of such parties.

To this bill the defendants demurred:

1st. Because it did not appear from it that the defendants, or either of them, had any direct or personal interest in the

lands which were the subject-matters of this suit; but on the contrary that they were sued in their official capacities only; and that the lands were a part of the public domain of the State of Texas, which was not and could not be made a party to this suit.

2d. Because it did not appear that while under the amendment 11 to the Constitution of the United States [which declares that " the judicial power of the United States shall not be construed to extend to any suit in law or equity commenced or prosecuted against one of the United States by citizens of another State, or by citizens or subjects of a foreign State"], the court could have no jurisdiction as between the complainant and the State of Texas, jurisdiction existed in a suit against two of the officers of said State in their official capacity alone, to decree portions of the constitution of the State, which had been accepted by the Congress of the United States, and which the defendants were sworn to obey, void.

3d. Because it did not appear that the bill was founded on fraud, accident, mistake, trust, specific performance, or any ground of equity jurisdiction; or that the same set out any equity against the defendants whatever; on the contrary, it appeared that the bill was brought to have sections 5 and 7 of article ten of the constitution of the State of Texas decreed void.

4th. Because it did not appear that the complainant, being an officer of the court, had a right to sue the defendants therein, nor that the court could have jurisdiction as between the complainant, though a citizen of the State of New York, and the defendants, as citizens of the State of Texas, in either their respective official or individual capacities.

5th. Because the "act incorporating the Memphis, El Paso, and Pacific Railroad Company," and the other acts referred to in the bill, did not amount to a contract between the State of Texas and the company.

6th. Because it did not appear that any designated third person or persons was or were about to have a patent granted him or them by the defendants, and that such third person

or persons was or were sought to be made a party or parties, nor that said bill was not too vague and indefinite.

7th. Because it did not appear that the creditors not specified of the company were made parties thereto, nor that the persons not specified applying for patents on locations of certificates, within the limits of the lands that were reserved, were made parties thereto; all of whom, according to the bill, had equities that ought to be determined in this suit, and hence were necessary and proper parties to this suit.

8th. Because it did not appear that the complainant had any equities that he was not bound to have litigated against such third persons not specified, and also against those not specified who had located certificates within the limits of the lands that were reserved, before he would have a right (which was not conceded) to invoke any action by means of a bill in a court of equity, in case such a court might have jurisdiction.

The demurrer was overruled, and, no answer being filed, a decree *pro confesso* was taken for the complainant, and on the 16th of February, 1871, a final decree was granted in accordance with the prayer of the bill, to the following effect:

"That in July, 1870, and at the time of the appointment of Gray as receiver, and at the date of the decree, the company was duly possessed of the franchise and right of, and to the land grant and land reservation of the company; that the said right and the franchise of the company were unimpaired, and in full force and virtue; that the provisions of the constitution of Texas, and of said ordinance of convention, so far as they impaired, or purported to impair the said charter, land grant, or land reservation, were contrary to the provisions of article 1, section 10, of the Constitution of the United States, and were in so far, null and void; and that the defendants should be perpetually enjoined from issuing, or causing or permitting to issue, any patent of the lands of the odd sections of said reservation, except on the certificates granted to the company, or its assigns."

From this decree appeal was taken by the defendants to this court.

*Mr. T. J. Durant and Mr. G. F. Moore, for the appellants; Messrs. B. R. Curtis, J. A. Davenport, and C. Parker, contra.*

Mr. Justice SWAYNE delivered the opinion of the court.

This is an appeal in equity from the decree of the Circuit Court of the United States for the Western District of Texas. The appellee was the complainant in the court below. The defendants demurred to the bill. The demurrer was overruled. The defendants stood by it. A decree as prayed for was thereupon rendered *pro confesso* for the complainant. The defendants removed the case to this court by appeal, and it is now before us, as it was before the court below, upon the demurrer to the bill. This brings the whole case as made by the bill under review. The facts averred, so far as they are material, are to be taken as admitted and true. We shall refer to them accordingly. The question presented for our determination is, whether the Circuit Court erred in overruling the demurrer. The appellants, having elected not to answer, the decree for the complainant followed as of course.

At the outset of our examination of the case, we are met by jurisdictional objections as to the parties — both complainant and defendants — which, before proceeding further, must be disposed of. We will consider first, those which relate to the complainant, and then, those with respect to the defendants.

The complainant was appointed to his office of receiver, in the suit in equity of *Forbes and others* v. *The Memphis, El Paso, and Pacific Railroad Company*, a corporation created by the State of Texas. The suit was in the same court whence this appeal was taken. In that case, on the 6th of July, 1870, it was, among other things, ordered and decreed, that the corporation should be enjoined from disposing of any of its effects, and that John A. C. Gray, the complainant in this suit, should be, and he was thereby " appointed receiver; to take possession of the moneys and assets, real and personal; roadbed, road, and all property whatsoever, of the said Memphis, El Paso, and Pacific Railroad Com

pany, wheresoever the same may be found, with power under the special order of the court, from time to time to be made, to manage, control, and exercise all the franchises, whatsoever, of said company, and, if need be, under the direction of the court, to sell, transfer, and convey the road, roadbed, and other property of said company, as an entire thing," &c.

On the 20th of January, 1871, it was further ordered by the court " that the said John A. C. Gray, receiver as aforesaid, be, and he is hereby, authorized and empowered to defend and continue all suits brought by or against the said Memphis, El Paso, and Pacific Railroad Company, whether before or after the appointment of said receiver, and whether in the name of said company or otherwise; defend all suits brought against him as such receiver or affecting his receivership, and to bring such suits in the name of said company, or in the name of said receiver, as he may be advised by counsel to be necessary and proper in the discharge of the duties of his office, and for acquiring, securing, and protecting the assets, franchises, and rights of the said company and of the said receiver, and for securing and protecting the land grant and land reservation of the said company."

It is to be presumed the receiver filed this bill, as it is framed in accordance with the advice of counsel.*

The authority given by the decree is ample. Still the question arises whether it was competent for him to proceed in his own name instead of the name of the company whose rights he seeks by this bill to assert. A receiver is appointed upon a principle of justice for the benefit of all concerned. Every kind of property of such a nature that, if legal, it might be taken in execution, may, if equitable, be put into his possession. Hence the appointment has been said to be an equitable execution. He is virtually a representative of the court, and of all the parties in interest in the litigation wherein he is appointed.† He is required to

---

* Bank of the United States v. Dandridge, 12 Wheaton, 70.

† Jeremy's Equity, 249; Davis v. Duke of Marlborough, 2 Swanston, 125; Shakel v. Duke of Marlborough, 4 Maddock, 463.

take possession of property as directed, because it is deemed more for the interests of justice that he should do so than that the property should be in the possession of either of the parties in the litigation.* He is not appointed for the benefit of either of the parties, but of all concerned. Money or property in his hands is in *custodiâ legis.*† He has only such power and authority as are given him by the court, and must not exceed the prescribed limits.‡ The court will not allow him to be sued touching the property in his charge, nor for any malfeasance as to the parties, or others, without its consent; nor will it permit his possession to be disturbed by force, nor violence to be offered to his person while in the discharge of his official duties. In such cases the court will vindicate its authority, and, if need be, will punish the offender by fine and imprisonment for contempt.§ The same rules are applied to the possession of a sequestrator.‖ Where property in the hands of the receiver is claimed by another, the right may be tried by proper issues at law, by a reference to a master, or otherwise, as the court in its discretion may see fit to direct.¶ Where property, in the possession of a third person, is claimed by the receiver, the complainant must make such person a party by amending the bill, or the receiver must proceed against him by suit in the ordinary way.** After tenants have attorned to the receiver, he may distrain for rent in arrear in his own name.†† In a suit between partners he may be required to carry on the business,

* Wyatt's Practical Register, 355.

† In re Colvin, 3 Maryland Chancery Decisions, 278; Delany *v.* Mansfield, 1 Hogan, 234.

‡ The Chautauque County Bank *v.* White, 6 Barbour, 589; Verplanck *v.* Mercantile Ins. Co. of New York, 2 Paige, 452.

§ De Groot *v.* Jay, 30 Barbour, 483; Angel *v.* Smith, 9 Vesey, 335; Russell *v.* E. A. R. R. Co., 3 Mac. & Gor. 104; Parker *v.* Browning, 8 Paige, 388; Noe *v.* Gibson, 7 Paige, 513; 2 Story's Equity, § 833, A. & B.

‖ 2 Daniels's Chancery Practice, 1433.

¶ Empringham *v.* Short, 3 Hare, 470.

** 8 Paige, 388; Noe *v.* Gibson, 7 Id. 513; 2 Story's Equity, *supra;* 2 J & W. 176; 2 Daniels's Chancery Practice, 1433.

†† 2 Daniels's Chancery Practice, 1437.

in·order to preserve the good-will of the establishment, until a sale can be effected.*

Here the·property in question is not in the possession of. the defendants. The possession of the receiver has not been invaded. He has not been in possession, is not seeking possession.; and there is no question in the case·relating to that subject. But the order of the court expressly requires the receiver to secure and protect " the assets, franchises, and rights," and " the land grant and reservation of said company." He is seeking to perform that duty by enjoining the appellants from doing illegal acts, which the bill alleges, if done, would render the rights and title of the company to the immense property last mentioned, of greatly diminished value, if not wholly worthless.

We think it is competent for him to perform this function in the mode he has adopted. The decree, in the case wherein he was appointed, expressly authorizes him to sue for that purpose in his own name. The order was made by a court of adequate authority in the regular exercise of its jurisdiction. No appeal has been taken, and the order stands unreversed.

This bill is auxiliary to the original suit.† It is analogous to a petition by a receiver to the court to protect his possession from disturbance, or the property in his charge from threatened injury or destruction. No title in the receiver is necessary to warrant such an application, or the administration by the court of the proper remedy. There can be no valid objection to the receiver here, in analogy to that proceeding, maintaining this suit. In the progress and growth of equity jurisdiction it has become usual to clothe such officers with much larger powers than were formerly conferred. In some of the States they are by statutes charged with the duty of settling the affairs of certain corporations when insolvent, and are authorized expressly to sue in their own names. It is not unusual for courts of equity to put them in charge of the railroads of companies which have fallen

---

* Marten v. Van Schaick, 4 Paige, 479.

† Freeman v. Howe, 24 Howard, 451; Jones v. Andrews, 10 Wallace, 327.

into financial embarrassment, and to require them to operate such roads, until the difficulties are removed, or such arrangements are made that the roads can be sold with the least sacrifice of the interests of those concerned. In all such cases the receiver is the right arm of the jurisdiction invoked. As regards the statutes, we see no reason why a court of equity, in the exercise of its undoubted authority, may not accomplish all the best results intended to be secured by such legislation, without its aid.

A few remarks will be sufficient to dispose of the jurisdictional objections as to the appellants.

In *Osborn* v. *The Bank of the United States,** three things, among others, were decided:

(1.) A Circuit Court of the United States, in a proper case in equity, may enjoin a State officer from executing a State law in conflict with the Constitution or a statute of the United States, when such execution will violate the rights of the complainant.

(2.) Where the State is concerned, the State should be made a party, if it could be done. That it cannot be done is a sufficient reason for the omission to do it, and the court may proceed to decree against the officers of the State in all respects as if the State were a party to the record.

(3.) In deciding who are parties to the suit the court will not look beyond the record. Making a State officer a party does not make the State a party, although her law may have prompted his action, and the State may stand behind him as the real party in interest. A State can be made a party only by shaping the bill expressly with that view, as where individuals or corporations are intended to be put in that relation to the case.

*Dodge* v. *Woolsey,*† *The State Bank of Ohio* v. *Knoop,*‡ *The Jefferson Branch Bank* v. *Skelly,*§ *Ohio Life and Trust Co.* v. *Debolt,*‖ and *The Mechanics' and Traders' Bank* v. *Debolt,*¶ proceeded upon the same principles, and were controlled

---

* 9 Wheaton, 738.  † 18 Howard, 331.  ‡ 16 Id. 369.
§ 1 Black, 436.  ‖ 16 Howard, 432.  ¶ 18 Id. 380.

by that authority, with respect to the jurisdictional question arising in each of those cases as to the defendant.

In *Woodruff* v. *Trapnall*,[*] a writ of mandamus was issued to the proper representative of the State of Arkansas to compel him to receive the paper of the Bank of the State of Arkansas in payment of a judgment which the State had recovered against the relator. The bank was wholly owned by the State, and the claim was made under a clause in the charter which had been repealed. Judgment was given against the respondent. The question of jurisdiction does not appear to have been raised. In *Curran* v. *The State of Arkansas, The Bank of the State of Arkansas, and others*,[†] it appeared that the bank had become insolvent. A creditor's bill was filed to reach its assets. The objection was taken that the State could not be sued. This court answered that the objection involved a question of local law, and that as the State permitted herself to be sued in her own tribunals, that was conclusive upon the subject. According to the jurisprudence of Texas, suits like this can be maintained against the public officers who appropriately represent her touching the interests involved in the controversy.[‡] In the application of this principle there is no difference between the governor of a State and officers of a State of lower grades. In this respect they are upon a footing of equality.[§]

A party by going into a National court does not lose any right, or appropriate remedy of which he might have availed himself in the State courts of the same locality. The wise policy of the Constitution gives him a choice of tribunals. In the former he may hope to escape the local influences which sometimes disturb the even flow of justice. And in the regular course of procedure, if the amount involved be large enough, he may have access to this tribunal as the

---

[*] 10 Howard, 190.      [†] 15 Id. 304.

[‡] Ward *v.* Townsend, 2 Texas, 581; Cohen *v.* Smith, 3 Id. 51; Commissioner General Land Office *v* Smith, 5 Id. 471; McLelland *v.* Shaw, 15 Id. 319; Stewart *v.* Crosby, Ib. 547.

[§] Whitman *v* The Governor, 5 Ohio State, 528; Houston and Great Northern Railroad Co. *v.* Kuechler, Commissioner, Supreme Court of Texas—not yet reported.

final arbiter of his rights.*    Upon the grounds of the juris-
prudence of both the United States and of Texas we hold
this bill well brought as regards the defendants.

It is insisted that the corporation, on behalf of which this
suit was instituted, has ceased to exist.

The bill avers that " The Memphis, El Paso, and Pacific
Railroad Company " . . . is " a corporation created by and
existing under certain statutes of the State of Texas herein-
after set forth," and that within the times limited by the
charter and extended by other acts the company " did all
acts and things necessary to the full and complete vesting,
securing, and preserving of the franchises, rights, and privi-
leges granted thereby."    The demurrer admits the truth of
these averments unless they are inconsistent with the stat-
utes which bear upon the subject.    The corporation was
created by an act of the legislature of Texas, approved Feb-
ruary 4th, 1856.    By the first section certain parties are
named and created a body politic and corporate, and the
general powers inherent in all such bodies are formally
given.    The second gives the right to construct a railway,
commencing on the eastern boundary of the State, between
Sulphur Fork and Red River, at the western terminus of
the Mississippi, Ouachita, and Red River Railroad, or of the
Cairo and Fulton Railroad, and running thence westerly to
the Rio Grande, opposite to or near the town of El Paso.
The twentieth section declares that no rights shall vest under
the charter until a certain amount of stock therein named
shall have been subscribed, and the percentage prescribed
shall have been paid upon it.    This requirement is covered
by the averment in the bill that the company had done
everything necessary to secure the vesting of all the fran-
chises given to it.    We do not understand that there is any
controversy on this subject.    All the other conditions pre-
scribed, involving the existence of the corporation, are
clearly subsequent.    They are found in the fourteenth sec-
tion of the charter, in the first section of the act of February

---

* Ex parte McNiel, 13 Wallace, 236.

5th, 1856, and in the third section of the act of February 10th, 1858.. To any argument drawn from these provisions. there are two conclusive answers:

(1.) There has been no judgment of ouster and dissolution. Without this they are inoperative. . To make them effectual they must be grasped and wielded by the proper judicial action.*

(2.) The offences and punishment denounced have been condoned and waived by the subsequent action of the legislature. The act of March 20th, 1861; the act for the relief of railroad companies, approved January 11th, 1862; the act for the relief of companies incorporated for purposes of internal improvement, approved February 18th, 1862; and the third section of the " Act to incorporate the Transcontinental Railroad Company," of the 27th July, 1870, each and all have that effect. The section last mentioned authorizes the company therein named to " purchase the rights, franchises, and property of the Memphis, El Paso, and Pacific Railroad Company, heretofore incorporated by this State." This is a clear affirmation, by implication, of the existence of the corporation, and of the possession of the rights, franchises, and property conferred by its charter. What is implied is as effectual as what is expressed.† These considerations are so clearly conclusive, that it is needless to advert more particularly in this connection to the legislation in question, or to pursue the subject further. There is no warrant for the proposition that the corporation had ceased to exist.

The heart of this litigation lies in the immense land grant which is in controversy between the parties. The objections we have considered are only outworks thrown up to prevent the conflict from reaching that point. It is insisted that the rights of the company touching the entire reservation have become forfeited.

---

* See Angell & Ames on Corporations, § 777, and the authorities there cited.

† United States v. Babbit, 1 Black, 57.

The fifteenth section of the charter provides as follows: "All the vacant lands within eight miles on each side of the extension line of said road, shall be exempt from location or entry, from and after the time when such line shall be designated by survey, recognition, or otherwise. The lands hereby reserved shall be surveyed by said company at their expense, and the alternate or even sections reserved for the use of the State. And it shall be the duty of said company to furnish the district surveyor of each district through which said roadway runs, with a map of the track of said road, together with such field-notes as may be necessary to the proper understanding and designation of the same."

There are other provisions prescribing various details not necessary to be particularly stated or considered.

A proviso in the seventeenth section declares that no title shall be permanently vested in the company or their assigns for land granted for the grading as contemplated by the act, until twenty-five miles of the road shall have been completed and put in running order. The proviso in the twentieth section of the charter, that no rights shall vest under it until the condition therein prescribed is complied with, has already been considered. Conditions of forfeiture of the lands granted are prescribed in this and subsequent acts. They are found in the fourteenth section of this act; in the first and fourth sections of the supplemental act of the same date; and in the third and fourth sections of the act of February 10th, 1858. These conditions will be considered hereafter.

The act for the relief of internal improvement companies of February 18th, 1862, declared that the time of the continuance of the war between the Confederate States and the United States should not be computed against any internal improvement company in reckoning the period allowed them for the completion of any work they had contracted to do.

The act of January 11th, 1862, for the relief of railroad companies enacted that the failure of any chartered railroad company of the State to complete any part of its road, as required by existing laws, should not operate as a forfeiture of its charter or of the lands to which the company would

be entitled, under the provisions of the act entitled "An act to encourage the construction of railroads in Texas by donations of land," approved January 30th, 1854, and the several acts supplementary thereto, provided the company should complete such portion of its road as would entitle it to donations of land under existing laws within two years from the close of the war.

The act for the benefit of railroad companies of November 13th, 1866, declared that the grant of sixteen sections of land to the mile to railroad companies theretofore, or thereafter, constructing railroads in Texas, should be extended under the same restrictions and limitations theretofore provided by law, for ten years after the passage of the act. These several acts are valid.*

By an act approved July 27th, 1870, the Southern Transcontinental Railroad Company was incorporated.

It was declared that the object of the company thus created was to construct and establish a railway line and telegraphic communication from the eastern boundary of the State of Texas, "and thence as near as practicable to the route of the Memphis, El Paso, and Pacific Railroad Company, to, or near, the town of El Paso." It was enacted that "the main line of said road shall follow, as near as may be practicable, the old survey of the Memphis and El Paso road." It was further enacted that "the said company, hereby incorporated, may purchase the rights, franchises, and property of the Memphis, El Paso, and Pacific Railroad Company, heretofore incorporated by this State," as before mentioned.

The first section of the ordinance of 1869 declared that all heads of families settled on vacant lands lying within the Memphis and El Paso railroad reserve, should be entitled to receive from the State of Texas eighty acres of land, including the place occupied, upon payment of the expenses of survey and patent.

By the second section it was declared that all the vacant

---

* See the 33d section of the constitution of Texas of 1869, and Texas v. White, 7 Wallace, 700.

land within the reserve was open to sale to settlers and pre-emption settlers, and subject to the location of land certificates. The third section declared that the company had forfeited its right to the land, and that certain certificates having been issued to the company and patents issued thereon, it was made the duty of the Attorney-General to institute legal proceedings to have such certificates and patents cancelled.

In November, 1869, the present constitution of Texas was adopted. It was subsequently approved by Congress.

Sections five and seven of this constitution are as follows:

"SECTION 5. All public lands heretofore reserved for the benefit of railroads or railway companies shall hereafter be subject to location and survey by any genuine land certificates.

"SECTION 7. All lands granted to railway companies which have not been alienated by said companies in conformity with the terms of their charter respectively, and the laws of the State under which the grants were made, are hereby declared forfeited to the State for the benefit of the school fund."

This summary gives a view of the statutory and constitutional provisions necessary to be considered in disposing of the question before us.

On the 20th of June, 1857, the company filed in the land office at Austin surveys showing the line of the road from the eastern boundary of the State to El Paso, which line was officially recognized by the Commissioner of the General Land Office of Texas. By the 1st of March, 1860, the company had surveyed, sectionized, and numbered all the sections and fractional sections of the vacant lands within the reservation, from the eastern boundary of the State to the crossing of the Brazos, of which due returns were made to the commissioner, and by him accepted. By the 10th of May, 1859, the company had marked and designated the central line of the road from the Brazos to the Colorado, and made proper returns to the office of the commissioner, by whom they were accepted. The lands granted to the company thereby became defined and officially recognized as such along the whole extent of their line.

In doing this work the company surveyed, numbered, and mapped each alternate or even section of public lands for two hundred and fifty miles in length, and sixteen miles in width, in behalf of the State of Texas. It was of great benefit to her, and is reported to the receiver to have cost the company more than $100,000.

By consent of parties the bill was amended *nunc pro tunc* in three particulars. The complainant admitted that no land within the reserve had been surveyed, sectionized, or numbered west of the Brazos River, and that no work had been done on the road before or since 1861, except as averred in the bill. He averred that he applied to the General Land Office for the number and names of those who had located certificates other than such as were issued to the company upon lands within the reservation, and that Keuchler, the defendant, answered that the number was very great, amounting to hundreds, and that a list could not be furnished without great time and labor. He averred further that parties were constantly locating certificates and making surveys within the reservation, and that they were allowed a specified time to make their returns, so that it was impossible for him to obtain a full list of such parties.

The company commenced work within one year from the 1st of March, 1856, and before the 1st of March, 1861, had completely graded more than fifty miles of its roadway, beginning at the eastern boundary line of the State and extending west in the direction of El Paso.*

We do not understand that up to that time there was a breach of any condition touching the existence of the corporation or its right to the lands within the reservation. Before that time the tracts east of the Brazos covered by the grant were definitely fixed by the surveys which the company had made. The title of the company to those west of the Brazos, though the sections were not designated, was equally valid. The good will of a lease which the landlord is in the habit of renewing is property, and rights

* See section 3 of the act of February 10th, 1858.

growing out of it, whether by contract or otherwise, will be protected and enforced by a court of equity.*

The rights of the company west of the Brazos were of a much more substantial character than those which were the subjects of judicial action in the cases cited.

The real estate of a corporation is a distinct thing from its franchises. But the right to acquire and sell real estate is a franchise, and the right to acquire the particular real estate designated in the charter of this company, and here in question, is within that category. It might, therefore, well be doubted whether this right could be taken from the company without an appropriate proceeding instituted for that purpose, and prosecuted to judgment by the State. But the view which we take of the case renders it unnecessary to pursue the subject.

We will recur to the conditions of forfeiture touching the land grant, and consider them irrespective of that point. The provisions to that effect, in the fourteenth section of the charter, are expressly superseded by those in the first section of the supplemental act of February 5th, 1856. The fourth section of that act prescribes a further condition. These provisions again are superseded by the third and fourth sections of the amendatory act of February 10th, 1858. The conditions prescribed by the last-named act are:

(1.) To survey the reserve as far as the Brazos River, within four years from the 1st of March, 1856.

(2.) To run and designate the centre line of the reservation from the Brazos to the Colorado, within fifteen months from the 10th of February, 1858.

(3.) To survey the whole reserve within ten years from February 10th, 1858.

(4.) To have a connection with some road leading to the Mississippi or Gulf of Mexico within ten years from February 10th, 1858.

(5.) That the company shall have finished and in running

---

* Phyfe *v.* Wardell & Woolley, 5 Paige, 268; see, also, Amour *v.* Alexander, 10 Id. 571.

order at least twenty-five miles of their road within one year after it is connected with certain other roads mentioned in the act, and at least fifty miles every two years thereafter until the road is completed.

(6.) That the right to acquire lands from the State by donation shall cease at the expiration of fifteen years from February 10th, 1858.

The two first conditions were performed within the time prescribed. These points are covered by the averments of the bill. The time limited for the performance of the third and fourth is extended from February 10th, 1868, to June 10th, 1873, by adding the time of the continuance of the war, according to the act of February 18th, 1862, before referred to. When the bill was filed there were no such roads as those mentioned in the fifth condition with which a connection could be formed. The fifteen years limited by the sixth condition expired February 10th, 1873. The period that elapsed during the war is to be added. That extends the time so much further.

The title of the company is therefore unaffected by the breach of any condition annexed to the grant.

But suppose there had been such breaches, as is insisted by the counsel for the appellants, the result must still be the same.

Except as to a small portion of the land in question the legal title is yet in the State. Whatever may be the right of the company it is wholly equitable in its character. With a few exceptions, which have no applicability in this case, the same rules apply in equity to equitable estates as are applied at law to legal estates. They are alike descendible, devisable, alienable, and barrable.*

There is wide distinction between a condition precedent, where no title has vested and none is to vest until the condition is performed, and a condition subsequent, operating by way of defeasance. In the former case equity can give

---

* Jickling on the Analogy of Estates, &c., 17; Croxall v. Shererd, 5 Wallace, 281.

no relief. The failure to perform is an inevitable bar. No right can ever vest. The result is very different where the condition is subsequent. There equity will interpose and relieve against the forfeiture upon the principle of compensation, where that principle can be applied, giving damages, if damages should be given, and the proper amount can be ascertained.* By the common law a freehold estate could not be created without livery of seizin, and it could not be determined without some act *in pais* of equal notoriety. Conditions subsequent are not favored in the law,† and when they are sought to be enforced in an action at law, there must have been a re-entry, or something equivalent to it, or the suit must fail. The right to sue at law for the breach is not alienable. The action must be brought by the grantor or some one in privity of blood with him.‡ In *Dumpor's Case,*§ it was decided that a condition not to alien without license is finally determined by the first license given.

Here the controlling consideration is, that the performance of all the conditions not performed was prevented by the State herself. By plunging into the war, and prosecuting it, she confessedly rendered it impossible for the company to fulfil during its continuance. This is alleged in the bill, and admitted by the demurrer.

The rule at law is, that if a condition subsequent be possible at the time of making it, and becomes afterwards impossible to be complied with, by the act of God, or the law, or the grantor, the estate having once vested, is not thereby divested, but becomes absolute.‖ The analogy of that rule applied here would blot out these conditions. But this would be harsh and work injustice. Equity will, therefore, not apply

---

* Wells *v.* Smith, 2 Edwards's Chancery, 78; see also as to the principle of compensation, Beaty *v.* Harkey, 2 Smedes & Marshall, 563.

† 4th Kent, 129.

‡ Nicoll *v.* New York and Erie Railroad Co., 2 Kernan, 121; Ludlow *v.* The New York and Harlem Railroad Co., 12 Barbour, 440; Webster *v.* Cooper, 14 Howard, 488.

§ 4 Reports, p. 119.

‖ Coke Littleton, 206 a, 208 b; 2 Blackstone's Commentaries, 156, 4 Kent, *130.

the principle to that extent. It will regard the conditions as if no particular time for performance were specified. In such cases the rule is that the performance must be within a reasonable time.* We are clear in our conviction that, under the circumstances, a reasonable time for performance had not elapsed when this bill was filed. As the State, by the act of July 27th, 1870, created the Southern Transcontinental Railroad Company, and authorized that company to "purchase the rights, franchises, and property of the Memphis, El Paso, and Pacific Railroad Company," it will be but right to allow a reasonable time for that purchase to be made, if such an arrangement can be effected, and for the vendee thereafter to perform all that was incumbent upon the Memphis, El Paso, and Pacific Railroad Company by its charter and the supplementary and amendatory acts. If that arrangement cannot be made, the latter company will have the right to provide otherwise for the fulfilment of its obligations to the State within such time, and thus consummate its inchoate title to the lands within the reservation. Either will be in accordance with the principles of reason and justice, and within the spirit of well-considered adjudications.†

Both parties will thus be put in the same situation, as near as may be, as if the breaches had not occurred. Neither will be subjected to any serious hardship. The State, by her own acts, has lost the benefits of an earlier completion of the work. The company has lost the income which it might have enjoyed, and has doubtless been thrown into embarrassments it would have escaped. The circumstances do not call for a severe application of the rules of law upon either side.

---

* Hayden v. Stoughton, 5 Pickering, 528; 4 Kent, *125, 126; Comyns's Digest, Title, "Condition G, 5."

† Walker v. Wheeler, 2 Connecticut, 299; Beaty v. Harkey, 2 Smedes & Marshall, 563; Moss v. Matthews, 3 Vesey, Jr., 279; 2 Vernon, 366; 1 Id. 83; 3 Brown's Chancery, 256; Taylor v. Popham, 1 Id. 168; 1 Bacon Abridgment, 642; 1 Maddock's Chancery Practice, 41, 42; City Bank v. Smith, 3 Gill & Johnson, 265

Breaches of such conditions may be waived by the grantor expressly or *in pais*.\* Such waiver is expressed in the statutes relating to the subject, to which we have referred, except the act creating the Transcontinental Company, and there it exists by the clearest implication.

That the act of incorporation and the land grant here in question, were contracts, is too well settled in this court to require discussion.† As such, they were within the protection of that clause of the Constitution of the United States which declares that no State shall pass any law impairing the obligation of contracts. The ordinance of 1869, and the constitution adopted in that year, in so far as they concern the question under consideration, are nullities, and may be laid out of view.‡ When a State becomes a party to a contract, as in the case before us, the same rules of law are applied to her as to private persons under like circumstances. When she or her representatives are properly brought into the forum of litigation, neither she nor they can assert any right or immunity as incident to her political sovereignty.§

A case more imperatively demanding the exercise of jurisdiction in equity could hardly be imagined than that presented in this bill. Should the interposition invoked be refused, doubtless the reservation would speedily be thatched over with adverse claims. A cloud would not only be thrown upon the title of the company, but the time, litigation, labor, and expense involved in the vindication of its rights, would very greatly lessen the value of the grant and materially delay the progress of the work it was intended to aid. The injury would be irreparable. It is the peculiar function of a court of equity in a case like this to avert such results.

It has been insisted that those holding adverse claims should have been brought into the case as parties. They

---

\* Dumpor's Case, 1st Smith's Leading Cases, 85, American note.

† Fletcher *v.* Peck, 6 Cranch, 137; New Jersey *v.* Wilson, 7 Id. 166; Dartmouth College *v.* Woodward, 4 Wheaton, 518; State Bank *v.* Knoop, 16 Howard, 369.

‡ Von Hoffman *v.* The City of Quincy, 4 Wallace, 535.

§ Curran *v.* The State of Arkansas, 15 Howard, 308.

are too numerous for that to be done. An application was made to one of the defendants for a list of their names, and it was not given. The important questions which have arisen between the appellants and the company can all be properly determined without the presence of other parties than those before us.

The parties referred to are sufficiently represented for the purposes of this litigation by the Governor and the Commissioner of the General Land Office. We feel no difficulty in disposing of the case as it is presented in the record.

There are other points, ably maintained by the learned counsel for the appellants, to which we have not adverted. They are sufficiently answered by what has been said. It would extend this opinion unnecessarily, and could serve no useful purpose, specifically to consider them.

The Circuit Court decided correctly. The decree appealed from is

AFFIRMED.

Mr. Justice HUNT did not hear the argument in this case and did not participate in its decision.

Mr. Justice DAVIS, with whom concurred the CHIEF JUSTICE, dissenting, said:

I am constrained to enter my dissent to the opinion and judgment of the court in this case, for the reason that this suit, although in form otherwise, is in effect against the State of Texas. The object which it seeks to obtain shows this to be so, which is to deprive the State of the power to dispose, in its own way, of its public lands, and this object, by the decision just rendered, is accomplished. In my judgment the bill should have been dismissed, because the State is exempt from suit at the instance of private persons, and on the face of the bill it is apparent that the State is arraigned as a defendant.