## AMERICAN LOCOMOTIVE CO. et al. v. HISTED et al.

(District Court, W. D. Missouri, W. D. December 16, 1926.)

No. 744.

1. **Courts** ☞524—Jurisdiction of suit against note holders' committee, involving fraudulent transactions by committee and receiver, is exclusively in court appointing receiver.

Jurisdiction of suit by owners of gold notes against note holders' committee, alleging fraudulent transactions involving committee and receiver for railroad properties appointed by federal court, each of which transactions involved loss to railroad properties, is exclusively in federal court appointing receiver.

2. **Courts** ☞524—Court having possession of property has right to decide conflicting claims thereto.

Where property is in actual possession of court, this draws to it the right to decide on

conflicting claims to ultimate possession and control.

**3. Trusts ⬥⟹261—Allegations of bill against note holders' committee for profits in buying and selling property, which they had no right to do, held not to constitute cause of action.**

Allegations of bill by owners of gold notes against note holders' committee, for accounting for profits which committee is charged to have made in buying and selling property, which the committee could not legitimately do in accordance with terms of agreement, *held* not to constitute a cause of action, in that it sought to hold committee responsible for something it did not and could not lawfully undertake to do.

**4. Trusts ⬥⟹250—Owners may not recover in equity for alleged profits by note holders' committee in buying and selling property to receiver for railroad issuing notes.**

If note holders' committee made profits for owners by buying property and selling it to receiver for railroad issuing notes, equity would not allow recovery by owners, since it would involve purchase of property at judicial sales, at which receiver should have been represented and would have been bidder, and would preclude owners of notes, or any one for them, from legitimately making such profit.

See, also, 18 F.(2d) 656.

Scarritt, Jones & North, of Kansas City, Mo., for plaintiffs.

Jas. H. Harkless, of Kansas City, Mo., for defendants Railway and Histed.

W. O. Thomas, of Kansas City, Mo., for defendant receiver.

J. E. Goodrich, of Kansas City, Mo., for defendants McLucas Commerce Trust Co. and Miller.

Edwin C. Meservey, of Kansas City, Mo., for defendant Hall.

Cooper & Neel, of Kansas City, Mo., for defendant Goebel.

REEVES, District Judge. Defendants have filed their motion to dismiss the above cause upon the grounds, among others, that the court is without jurisdiction, and that the bill fails to state a cause of action. A brief statement of facts is necessary to a clear understanding of the questions involved.

Plaintiffs allege that they are owners of certain "two-year 6 per cent. gold notes," issued by the Kansas City, Mexico & Orient Railroad Company; that such notes are of an issue aggregating $5,640,200, dated July 15, 1914, and are or were secured by a pledge of certain named bonds and stocks; that said gold notes are in default, both as to principal

and interest, and have been since April 30, 1916; that the defendant William T. Kemper became receiver of the properties and assets of the said Kansas City, Mexico & Orient Railroad Company on the 16th day of April, 1917; that the defendants Histed, Hall, Sanderson, Gray, Ayer, Goebel, McLucas, and Miller, Jr., are all "members of the so-called American gold note holders' protective committee."

The following additional facts are stated in the bill:

The two-year 6 per cent. gold notes, above mentioned, were issued in furtherance of the plan to reorganize and refinance the properties of the railroad for which the said Kemper was appointed receiver. The railroad and its subsidiaries had been in financial difficulties, but because of the World War, and its effect upon finances, reorganization plans did not work out satisfactorily, with the result that the gold notes, issued as aforesaid, could not be redeemed and retired according to the plan of reorganization. At this juncture the holders of said notes were approached by the defendant members of the alleged protective committee with the suggestion that they were "men of prominence in the financial world and legal profession," and "were especially skilled and capable of dealing with such a situation, and that they, by uniting their strength and efforts, if duly authorized to act for and on behalf of a large number of gold note holders, could master the situation and thereby get great gain unto themselves, and at the same time protect the gold note holders, and so to that end they hit upon the scheme of drafting the so-called deposit agreement, and of persuading residents of the United States owning a great majority of all such notes owned in America and a clear majority of all of the outstanding gold notes to become parties thereto."

Accordingly the protective committee was selected under the deposit agreement. The original committee was composed of J. Z. Miller, Jr., Henry Sanderson, William J. Gray, Herbert F. Hall, and Clifford Histed. Subsequently the committee was increased by adding the names of Charles F. Ayer, Peter W. Goebel, and W. S. McLucas. The deposit agreement was dated March 30, 1916, one month prior to the maturity and default of said gold notes, and provides, among other things, "that the holders of said notes shall unite and organize for their mutual advantage and the protection of their interests," and each of the depositors agreed to deposit his note or notes, so that same might become

subject to the absolute control of said protective committee, and without right or power on his part to withdraw such note or notes, or to transfer same, only subject to the approval of the committee.

The committee became the trustee of an express trust, according to the allegations of the bill, with the legal title to all of the notes thus deposited vested absolutely in it. It was, moreover, agreed "that the committee is and shall be vested with all of the rights, powers, and privileges of the owners of said notes, claims, and causes of action, and particularly (but not by way of limitation) every right, power, and privilege conferred upon the owner and holder of said notes, by the terms thereof and by the trust indenture securing the same, or otherwise, and that the committee may deal with any securities or other property acquired by it or coming into its hands (as the proceeds or avails of deposited notes or otherwise) in like manner as it is hereby authorized to deal with deposited notes, and it may exercise and enjoy all the rights, powers, and privileges of owners thereof, and shall have power and authority to do any acts the committee may consider desirable to protect or enforce any security for, or procure the payment of, any deposited notes held or represented by it, or otherwise to protect the rights and interests of the depositor."

In fine the deposit agreement undertook to clothe the committee with the absolute right, with respect to said notes so deposited, to take any and all action with respect thereto as the judgment of the committee might deem proper. It was specifically provided that, in case of a sale of the railroad properties, whether owned by the railroad or its subsidiary companies, "the committee is hereby authorized and empowered, in its discretion, to purchase the same or any part thereof for the purposes of this Agreement * * * at such price as the committee may consider judicious, and to make any arrangements that may be necessary to accomplish such purchase, including the use of the deposited notes and other property in its hands in making payment therefor."

By the deposit agreement, it is expressly provided "that the committee undertakes in good faith to execute the same and that all of the provisions thereof shall extend to and be obligatory upon the parties hereto, and their and each of their heirs, administrators, successors, and assigns, respectively." It is charged in the petition that the members of the committee were faithless to their trust, conspired and colluded with the defendant Kemper, and unlawfully despoiled "these plaintiffs of their rights, titles, and interests in and to the Orient Railroad properties and assets." As a part of the scheme to defraud, it is alleged that "the said committee and said Kemper caused it to be brought about that he was appointed receiver of the said Orient Railroad properties and assets, which occurred on or about April 16, 1917, and thereupon said Kemper, in furtherance of the said scheme, conspiracy, and collusive understanding, caused said Histed to be appointed as attorney for him as receiver, and thereafter they assumed to and did practically direct the affairs involving the securities of the gold note holders."

For specific acts of delinquency or bad faith on the part of the protective committee, it is alleged that certain subsidiary corporations held either legal or equitable claims against the railroad company or property necessary for its use, and that the members of the committee, acting with Kemper, brought about judicial sales of such claims and property rights, and that at one of such sales the defendant Peter W. Goebel acquired certain claims and property rights upon a bid of $350,503, which was $503 in excess of the highest bid tendered by the protective committee. This particular sale was held on February 10, 1917, and two days thereafter it was duly approved. On November 10, 1917, the said "Kemper, as receiver," took over and acquired said property from Goebel at the price and sum of $850,000. This transaction, however, was not consummated until "Goebel was selected and made a member of the said note holders' protective committee by said defendants herein, and so they participated in despoliation of the trust property to the extent of something more than half a million dollars."

Again it is charged that a certain corporation known as the Carnegie Steel Company had a claim amounting approximately to $333,593.63 against the railroad company; that in 1917 it was commonly known that the said corporation was willing to take about one-third of the principal amount of its claim in settlement thereof, "and this was known to the members of the American note holders' protective committee, and pursuant to and as part of the said scheme, conspiracy, and collusive understanding that claim was acquired some time in the year 1917," by some unknown person, "at the instance and request * * * of the said note holders' protective committee," and taken over "by defendant Kemper as receiver on or about November

10, 1917, at and for the price and sum of $250,000, * * * so that there was a clear profit in making that transaction, * * * which profit plaintiffs state upon information and belief was shared or participated in by the members or dominant members of the said note holders' committee and the said Kemper."

Another specific act of bad faith charged was a transaction involving the properties of the Kansas City Outer Belt Electric Railroad. "These terminal or belt line properties had a great and substantial value, and especially so in connection with and as a part of the Orient system, and the nature of the properties and their value, both intrinsically and as a part of the Orient system, were known to the members of the said protective committee and to defendant Kemper, and that value was at the time of the sale thereof a large sum, to wit, more than a million dollars."

Under separate receiverships such properties were sold at a judicial sale on June 28, 1922. It is averred that the committee, as well as Kemper, as receiver, were represented at said sale. The committee's bid was $300,000, but one York, "an intimate friend and associate of the members of the protective committee and of said Kemper, put in a bid of $330,500, and thereupon said properties were struck off and sold to him at that sum, and the members of the said committee and said Kemper consented to and approved that sale. * * * Plaintiffs aver that the assets so sold were reasonably worth a million dollars at the time of the sale, and that thereby a value of more than $650,000 was, through the negligent collusion and scheming and infidelity of the committee and of defendant Kemper, diverted from the said trust estate."

Thereafter it was charged that the "Orient Railroad properties were offered for sale at a judicial sale held at Wichita, Kan., on March 27, 1924," and that Clifford Histed represented the said protective committee as a bidder, and bought said property for $3,-000,000, but said Histed accepted $25,000 for an option on the purchase, that said option was not exercised, and that the consideration was forfeited to Histed. It is claimed that this belonged to the committee.

Generally it is charged in the bill that other properties were handled in a similar way, with the result that the committee, acting with Kemper, depleted the trust estate in the sum of $1,335,000. Plaintiffs, therefore, pray for an accounting by "the said American note holders' protective committee and the said Kemper," and that they be "adjudged to give an accounting of their stewardship in respect to the particular transactions herein set up."

The foregoing statement covers substantially the principal averments of the bill. Other facts, if they may become pertinent, will be stated in the course of this memorandum opinion.

1. It will be observed from the foregoing statements that the action proceeds upon the theory of the creation of an express trust, and delinquency and bad faith on the part of the trustees, with resultant loss and depletion of the trust fund. Under such circumstances, it is proper to bring in as defendants parties who may have aided or abetted the trustees in their wrongdoing, and who participated in the gains thereof. However, each of the transactions enumerated involve the conduct of the defendant Kemper as receiver of the Kansas City, Mexico & Orient Railroad Company. If Kemper conspired with Goebel and others to pay $850,000 as receiver for property which the receiver could have acquired for $350,000, and if, as charged, he participated in the profits of the transaction, then his conduct as receiver is so seriously involved as to require supervision by the court of his appointment. Clearly such a serious breach of trust should have been called instantly to the attention of the court in which the receivership was pending, and that court should have had, and should now have, an opportunity to recover through its authorized agency a sum of money which, under the circumstances, could not lawfully go to the protective committee, or anybody else, as it belonged to the assets of the Kansas City, Mexico & Orient Railroad Company.

The averments of the petition amount to a statement that Kemper, Goebel, and members of the committee conspired to purchase for a consideration of $350,000 property for which the receiver paid $850,000, and that this sum was divided among the receiver, Goebel, and members of the protective committee. Moreover, it is charged that the said Kemper was appointed receiver as a part of the fraudulent scheme to despoil the plaintiffs. It would follow that every and all actions taken by him were in his official capacity as receiver.

[1] The other transactions enumerated by the plaintiffs do not consist of a despoliation and waste of their rights or property, but each and every one, including the first transaction, involves loss to the railroad properties. For instance, in the first transaction enumerated Kemper paid out of the funds of the railroad company $500,000 to himself and others. In the second enumerated transaction it is alleg-

ed that he paid $265,000 for property that he could have bought for $115,000, and that he, with others, shared in the division of this unlawful profit. In the third enumerated transaction it is charged that Kemper, as receiver, conspired to have property useful to his estate and worth millions diverted into other hands. The said Kemper having been appointed receiver by the United States District Court of Kansas, from which court he has not been discharged, the suit was not only one properly removable from the state court, where it was first brought, to the federal court, but this court has no jurisdiction to determine a matter which belongs exclusively to the federal District Court for the state of Kansas. All of the property of the Orient Railroad Company is under the control of that court, and the defendant Kemper is an officer of that court for its preservation and administration. The proceeding, therefore, is not one that can be had in this court, but such proceeding can only be had in the District Court having charge of the estate. For this reason alone the motion to dismiss must be sustained. "The court will not allow him [the receiver] to be sued touching the property in his charge, nor for any malfeasance as to the parties, or others, without its consent." Davis v. Gray, 16 Wall. 203, loc. cit. 218 (21 L. Ed. 447).

[2] It is well settled that, where property is in the actual possession of a court, this draws to it the right to decide upon conflicting claims to its ultimate possession and control. Rouse v. Letcher, 156 U. S. 47, 15 S. Ct. 266, 39 L. Ed. 341; White v. Ewing, 159 U. S. 39, 15 S. Ct. 1018, 40 L. Ed. 67. The instant case must be construed as ancillary to the main suit, and therefore cognizable only in the federal court. Tardy's Smith on Receivers (2d Ed.) 699.

[3] 2. The terms of the deposit agreement, whereby the protective committee became responsible for the gold notes deposited by the plaintiffs, did not contemplate that the committee would engage in the enterprise of buying and selling securities or other property at a profit. The very nature of the agreement contemplated protection of the assets of the Orient Railroad Company and its subsidiaries, so as to preserve the corpus of the estate for the discharge of the obligations of the estate. The committee could not legitimately do more. No funds were deposited with the committee for speculative purposes, and said committee did not undertake on behalf of the plaintiffs to engage in an investment business. It is not charged that the notes deposited by

the committee were misused, or that the conduct of the committee has been such as to cause loss to the Orient properties. On the contrary, in the oral argument it was specifically stated that the railroad properties had been preserved

The plaintiff sued for an accounting to them for profits which the committee is charged to have made in buying and selling property to the receiver of the railroad company and in conspiracy with the receiver. Such allegations do not constitute a cause of action. The plaintiffs seek to hold the committee responsible for something it did not and could not lawfully undertake to do. Moreover, the trust consisted of the gold notes deposited with the committee. No trust relationship developed by reason of any speculative enterprise independent of a basic arrangement for engaging in such a venture by the assembling of a fund and an agreement that it should be so used.

[4] 3. Let it be assumed that the so-called protective committee did undertake to make profits for plaintiffs and other holders of the said gold notes by buying property and selling it to the receiver. According to the allegations of the bill, this would involve the purchase of property at judicial sales at which the receiver should have been represented, and where, in the proper application of good business principles, the receiver would have been a bidder. Such profits could not have been legitimately made, under the circumstances stated in the bill, by the plaintiffs, or any one for them. In that view, their presence in court, under a well-known maxim of equity, is not welcome.

In accordance with the foregoing, the motion to dismiss will be sustained.