CENTRAL OF GEORGIA RY. CO. v. McLENDON et al.

(Circuit Court, N. D. Georgia. November 30, 1907.)

1. COURTS—JURISDICTION OF FEDERAL COURTS—SUIT AGAINST STATE.

Where a state statute provides that suits to recover penalties for its violation shall be brought in the name of the state by direction of the Governor, the Governor acts thereunder officially as executive officer of the state having a discretionary power, and a suit to enjoin him from exercising such power is one against the state, of which a federal court is without jurisdiction under the eleventh constitutional amendment.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 13, Courts, § 844½.

Federal jurisdiction of suits against state, see note to Tindall v. Wesley, 13 C. C. A. 165.]

2. CARRIERS—STATE REGULATION—SUIT TO ENJOIN ENFORCEMENT—PARTIES.

Where the relation of the Attorney General of a state to a state Railroad Commission and the enforcement of its orders is simply that of his general official relation as the principal law officer of the state, he is not a necessary nor proper party to a suit to enjoin the enforcement of an order made by the commission.

3. SAME—JURISDICTION OF FEDERAL COURT.

Where a state Railroad Commission is given continuing power of supervision over the matter of compliance with its orders and regulations, with power to change or repeal the same, and is made suable by statute, a suit may be maintained against it and its several members and officers in a federal court to enjoin the enforcement of an order it has promulgated on the ground that the same is confiscatory.

157 F.—61

**4. SAME—PRELIMINARY INJUNCTION—ESTOPPEL.**

In a suit by a railroad company to enjoin the enforcement of an order of a state Railroad Commission fixing rates, complainant's right to a preliminary injunction or to relief on the merits is not prejudiced by the fact that, being denied a preliminary injunction on its ex parte application, it put into effect the rates prescribed by the order, being constrained thereto by the statutory penalties to which it would otherwise be liable.

**5. SAME—PLEADING.**

In a suit by a railroad company to enjoin the enforcement of an order of a state Railroad Commission fixing rates, allegations in the bill, filed before the order has gone into effect, that the new rate is unreasonable and if enforced will result in a large loss of revenue to complainant, are not admitted by a demurrer.

**6. SAME—PRELIMINARY INJUNCTION—UNREASONABLENESS OF RATE.**

On a motion for a preliminary injunction to restrain the enforcement of an order made by a state Railroad Commission reducing passenger rates within the state, on the ground that the rate therein fixed is unreasonable and confiscatory, the showing *held* insufficient to warrant the granting of such injunction, in that.it did not enable the court to determine in advance of an actual trial that the effect of the enforcement of the order would be to lessen complainant's net earnings from that part of its business.

In Equity. On motions for preliminary injunction to amend the bill by making new parties and on demurrer to bill.

For opinion of Circuit Judge Shelby in this case, see 155 Fed. 974.

Lawton & Cunningham, for complainant.

John C. Hart, Atty. Gen., James K. Hines, Wimbish, Watkins & Ellis, and Hopper Alexander, for respondents.

NEWMAN, District Judge. This suit was brought originally by the Central of Georgia Railway Company against H. Warner Hill, O. B. Stevens, S. G. McLendon, F. E. Calloway, and George Hillyer, members of the Railroad Commission of Georgia, and against the Railroad Commission, and against John C. Hart, Attorney General of the state of Georgia, and James K. Hines, attorney for the Railroad Commission. By amendment the complainant seeks to make Hon. Hoke Smith, Governor of Georgia, and George F. Montgomery, secretary of the Railroad Commission, parties defendant. The purpose of the bill is an injunction restraining the defendants from putting into effect circular 334, promulgated by the Railroad Commission of Georgia on June 7, 1907, to become effective on September 2, 1907, by which circular the passenger rate which complainant company was allowed to charge over its lines in Georgia for local business was reduced from 3 cents per mile to 2½ cents per mile. The circular also provided varying rates for the other railroads in the state on local business. When the application for leave to amend by making the Governor and the secretary of the Railroad Commission parties defendant, the court was unwilling without argument and full hearing to allow the same, and so at that time the following order was made:

"Ordered that the hearing be postponed until Monday, October 7, 1907, at 10 o'clock a. m., at which time the court will determine whether or not Honorable Hoke Smith, Governor of Georgia, can and should be made a party defendant to this cause, and whether or not injunction pendente lite shall issue against him and the other defendants, as prayed in the bill."

The defendants requested that the question of making the Governor a party should be decided in advance of the determination of the other matters involved at the hearing; but it was agreed that the whole case should be heard together, and this question of making the Governor a party be determined in advance of the other important questions presented. This branch of the case, as well as the entire case, has been argued by both sides with thoroughness and very great ability. The argument has been worthy of the very important issues involved. The objection to making the Governor a party, of course, is based upon the proposition that to do so would make the proceedings a suit against the state of Georgia, in violation of the eleventh amendment to the Constitution of the United States. The necessity of making the Governor a party defendant and the right to do so is based by complainant upon the provisions of the act of the Legislature approved August 23, 1907 (Laws Ga. 1907, p. 72), increasing the number of the Railroad Commission of Georgia, and enlarging its powers. The provision referred to is contained in section 12 of the act, which, naming the penalties to which railroads and other public corporations coming within the provisions of the act shall subject themselves for a violation of the provisions of the act, and of the order, directions, and requirements of the Railroad Commission, provides that the proceeding to recover such penalties shall be brought in the name of the state of Georgia by direction of the Governor. The contention is that the Governor is made by this provision of the act of the Legislature a mere ministerial officer, to enforce the penalties provided for in the act. The principal case relied upon by the complainant to support this contention that the Governor of the state may properly be made a party without violating the eleventh amendment is the case of Davis v. Gray, 83 U. S. 203, 21 L. Ed. 447. In that case Davis, the Governor of the state, and the Commissioner of the General Land Office, were enjoined from signing patents to land to which the complainant made claim under former grants. The decision of the Circuit Court enjoining the Governor and the Commissioner of the General Land Office was affirmed by the Supreme Court, the Chief Justice and Mr. Justice Davis dissenting. This case has been frequently referred to since. In the case of Cunningham v. M. & B. Railroad Co., 109 U. S. 446, 3 Sup. Ct. 292, 609, 27 L. Ed. 992, it was discussed by Mr. Justice Miller, delivering the opinion of the court as follows:

"But it is clear that in enjoining the Governor of the state in the performance of one of his executive functions the case goes to the verge of sound doctrine, if not beyond it, and that the principle should be extended no further."

In Pennoyer v. McConnaughy, 140 U. S. 1, 11 Sup. Ct. 699, 35 L. Ed. 363, in the opinion by Mr. Justice Lamar, it is said of the case of Davis v. Gray that:

"Some of the expressions in the opinion in that case were criticised in the subsequent case of United States v. Lee, 106 U. S. 196, 244, 1 Sup. Ct. 240, 27 L. Ed. 171, and also in Re Ayres, 123 U. S. 443, 487, 488, 8 Sup. Ct. 164, 31 L. Ed. 216, where the objectionable expressions were examined and held to have been mere dicta. It has not been overruled, however, but, on the contrary, it has been cited with approval and relied upon as authority in a number of subsequent cases; and the underlying principles of it are regarded as sound."

Even allowing, therefore, that the case of Davis v. Gray while going "to the verge of sound doctrine" still stands as authority, it is not in my judgment applicable to the present case and to the question presented here of the right to make the Governor a party defendant. In no case has it been held that the Governor of a state can be made a party to any suit seeking to interfere with him in the discharge of his duties as the chief executive of the state, or as to acts proposed to be performed in his capacity as Governor. Certainly this is true where the acts involve the exercise of discretion in the executive. It is only where a mere ministerial duty devolves upon the Governor by a legislative act, such as the duty imposed in Davis v. Gray, supra, and in Louisiana et al. v. McComb, 92 U. S. 531, 23 L. Ed. 623. In this latter case Louisiana v. McComb the Governor of the state and other state officers were made members of a board of liquidation with power to issue bonds of the state to a named amount, and by a subsequent act of the Legislature of Louisiana the board thus constituted was authorized to issue a portion of the bonds provided for to the Louisiana Levee Company in liquidation of a debt claimed to be due it under a contract with the state. The bill was brought by McComb to enjoin the board of liquidation from issuing bonds to the levee company. In the opinion in this case by Mr. Justice Bradley, he makes the distinction between acts of the executive officers of the state that will and will not render such officers subject to mandamus or injunction, as follows:

"A state, without its consent, cannot be sued by an individual, and a court cannot substitute its own discretion for that of executive officers in matters belonging to the proper jurisdiction of the latter. But it has been well settled that when a plain official duty, requiring no exercise of discretion, is to be performed, and performance is refused, any person who will sustain personal injury by such refusal may have mandamus to compel its performance; and, when such duty is threatened to be violated by some positive official act, any person who will sustain personal injury thereby, for which adequate compensation cannot be had at law, may have an injunction to prevent it. In such cases the writs of mandamus and injunction are somewhat correlative to each other. In either case, if the officer plead the authority of an unconstitutional law for the nonperformance or violation of his duty, it will not prevent the issuing of the writ. An unconstitutional law will be treated by the courts as null and void. Osborn v. Bank of the United States, 9 Wheat. 859, 6 L. Ed. 204; Davis v. Gray, 16 Wall. 220, 21 L. Ed. 447."

So that the question is really resolved against the complainant, and against the allowance of the amendment, if the Governor of Georgia under the recent act of the Legislature acts as the chief executive of the state, with discretionary powers in directing the enforcement of the penalties provided for in the act. It seems clear to me that it was never intended that the Governor should be made, as it is claimed, a mere ministerial officer, to direct penalties whenever it was reported to him by the Railroad Commission that any order, etc., of the commission had been violated.

The argument assumes that the Governor in every instance must under the provisions of this act at once direct suits for penalties to be brought. I do not believe this assumption is justified either by the language of the act or by its intent or purpose. When penalty suits are directed to be brought in the name of the state, it is done, of course, following the act by the direction of the Governor; but is the Gov-

ernor shorn of all his discretionary power as the constitutional chief executive of the state by this provision of the act, and shall it be said that he must blindly and without investigation or consideration direct the institution of penalty suits? I think not. It is clear to me that it was never intended by this act to confer any power upon the Governor beyond that he would otherwise have as chief executive of the state. And it might not be unfair, indeed, to hold, as has been contended for here, that this provision was intended as a limitation upon the power to bring penalty suits; that is, that they should only be brought in the name of the state and by direction of the Governor. If a report should be made to the Governor that certain orders, directions, or requirements of the commission had not been complied with, and the officials of the railroad or other public corporation interested should show the Governor the impossibility of a compliance at the time with the order, it surely cannot be claimed that the Governor would have no power to withhold and decline to give the order for the institution of the penalty proceeding. If all this is true, then under no view of the subject is the Governor a proper party defendant to this case. My judgment is that he is not, and the application to amend (using the language of the proposed amendment) "by making Honorable Hoke Smith, who is also the Governor of Georgia," a party defendant, is denied.

Neither do I think that the Attorney General of the state is a proper party to this suit. His relation to the Railroad Commission and to the enforcement of its order or orders is simply that of his general official relation as the principal legal representative of the state. He has no peculiar relations to the commission at all. He not only has no such relations, but by the provision of the act of August 22, 1907, provision is made for a special attorney for the Railroad Commission. While the Attorney General appears for the state in this litigation, and has made an argument in the matters now under consideration, he appears as counsel, and simply in his capacity as Attorney General. I do not think he is a necessary or proper party, and so much of the demurrer to the bill as goes to the question of his being a proper party to the case will be sustained.

I am as well satisfied, however, that the Railroad Commission, the several members of the commission, the special attorney, and the secretary of the commission are proper parties. The contention of the counsel for the defendant is that neither the Railroad Commission nor the members thereof are proper parties to a suit like this, for the reason that, when the commission has made and promulgated an order, rule, or regulation, its duty and power in the premises is ended. Counsel claim that the functions in this respect of the Railroad Commission are very much like those of a court; that it only determines the matter before it, and makes its decision, and then it is for the proper officers to enforce the same. The argument is that the commission having nothing further to do in the matter, and no further connection with the orders, etc., after they are promulgated, there is nothing against which an injunction could operate. Is this contention supported even by the act of August, 1907? Section 6 of the act provides, among other things:

"Said commission is hereby given authority to examine into the affairs of said companies and corporations and to keep informed as to their general condition, their capitalization, their franchises, and the manner in which their lines, owned, leased or controlled, are managed, conducted and operated, not only with respect to the adequacy, security and accommodation afforded by their services to the public and their employees, but also with reference to their compliance with all provisions of law, orders of the commission, and charter requirements."

While it is true that sections 2196 and 2197 of the Civil Code of Georgia of 1895, which provided, in substance, that proceedings should be instituted by the commission through the Solicitor General, was repealed by the act of August, 1907, I think this act still leaves supervision over the matter of compliance with its orders, rules, and regulations in the hands of the commission itself. In addition to this, it was repeatedly urged in argument that if the rate of passenger fare allowed to be charged by the railroads of the state in circular 334 should prove to be inadequate, and not give to the railroads a fair return, the Railroad Commission would modify the same and grant the railroads relief. This is said in one of the briefs for the defendant:

"If, after actual test for a reasonable length of time, the rates should prove injurious, the railroads could appeal to the commission with the confident expectation that appropriate relief will be granted."

And such has been substantially the statement of all the counsel for the defendant. If this be true, the order of the commission contained in circular 334 is not like the judgment of a court. The continuance of the order, or its modification or repeal, is still within the power of the commission. In this sense it keeps the order in force and effect. By the provision of the act of August, 1907, the Railroad Commission is made subject to suit. Section 14 of the act provides that:

"The domicile of the Railroad Commission is hereby fixed at the capitol of the state, in Atlanta, Fulton county, and no court of this state, other than those of Fulton county, shall have or take jurisdiction in any suit or proceedings brought or instituted against said commission or any of its orders or rules."

Of course, one purpose of the act was to provide one county only in which the commission should be subject to suit, and not to allow suit to be brought against the commission in any county of the state which might happen to be the residence of one of the members of the commission. But it is also clear that it intended to make the commission subject to suit in a proper court. In Reagan v. Farmers' Loan & Trust Co., 154 U. S. 362, 14 Sup. Ct. 1047, 38 L. Ed. 1014, it appears that by the act of legislation establishing a Railroad Commission it was provided that any railroad company dissatisfied with the action of the commission might bring suit in "any court of competent jurisdiction in Travis county, Texas, against said commission as defendant." It was said in the opinion of the court:

"Were this in terms a suit against the state, if by express statute the state had waived its exemption and consented that suit might be brought against it by name in any court of competent jurisdiction in Travis county, it might well be argued that thereby it consented to a suit brought by a citizen of another state in the Circuit Court of the United States for the Western Dis-

trict of Texas sitting in Travis county, on the ground that the limitations of the eleventh amendment to the federal Constitution simply create a personal privilege which can at any time be waived by the state."

It is true that the act there provided that suit might be brought in "a court of competent jurisdiction in Travis county." Here the provision is "of Fulton county," but the difference would not seem to be very material. The Circuit Court of the United States hearing this case is sitting in Fulton county. It was further said in the opinion in the Reagan Case that:

"It may be laid down as a general proposition that, whenever a citizen of a state can go into the courts of a state to defend his property against the illegal acts of its officers, a citizen of another state may invoke the jurisdiction of the federal courts to maintain a like defense. A state cannot tie up a citizen of another state, having property rights within its territory invaded by unauthorized acts of its own officers, to suits for redress in its own courts. Given a case where a suit can be maintained in the courts of the state to protect property rights, a citizen of another state may invoke the jurisdiction of the federal courts. Mercer County v. Cowles, 7 Wall. 118, 19 L. Ed. 87; Lincoln County v. Luning, 133 U. S. 529;[1] Chicot County v. Sherwood, 148 U. S. 529, 13 Sup. Ct. 695, 37 L. Ed. 546."

The same right would seem to exist if the complainant sought the Circuit Court of the United States upon any other jurisdictional ground than that of diverse citizenship.

In the case of Smyth v. Ames, 169 U. S. 466, 18 Sup. Ct. 418, 42 L. Ed. 819, the Nebraska statute provided that any railroad company might show in a proper action brought in the Supreme Court of the state that the rates therein prescribed were unreasonable and unjust, and it was contended that it took from the Circuit Court of the United States its jurisdiction in respect of the rates prescribed in the act. As to this, the court in the opinion by Mr. Justice Harlan said:

"We cannot accept this view of the equity jurisdiction of the Circuit Courts of the United States. The adequacy or inadequacy of a remedy at law for the protection of the rights of one entitled upon any ground to invoke the powers of a federal court is not to be conclusively determined by the statutes of the particular state in which suit may be brought. One who is entitled to sue in the federal court may invoke its jurisdiction in equity whenever the established principles and rules of equity permit such a suit in that court; and he cannot be deprived of that right by reason of his being allowed to sue at law in a state court on the same cause of action. * * * But, if the case in its essence be one cognizable in equity, the plaintiff—the required value being in dispute—may invoke the equity powers of the proper Circuit Court of the United States, whenever jurisdiction attached by reason of diverse citizenship or upon any other ground of federal jurisdiction."

In Mississippi Railroad Commission v. Illinois Central Railway Co., 203 U. S. 335, 27 Sup. Ct. 90, 51 L. Ed. 209, it is said in the opinion of the court that:

"The first objection raised by the appellant is that this suit is, in substance, one against a state. The commission was created by the state of Mississippi, under the authority of its Constitution and laws, for the purpose of supervising, and to some extent controlling, the acts of the railroads operating within the state. Such a commission is subject to a suit by a citizen"—citing Reagan v. Farmers' Loan & Trust Co., 154 U. S. 362, 14 Sup. Ct. 1047, 38 L. Ed. 1014; Smyth v. Ames, 169 U. S. 466, 18 Sup. Ct. 418, 42 L. Ed. 819; Prout v. Starr, 188 U. S. 537, 23 Sup. Ct. 398, 47 L. Ed. 584.

[1] 10 Sup. Ct. 363, 33 L. Ed. 766

To my mind there is no doubt that the Railroad Commission of Georgia is subject to suit in a court of competent jurisdiction in respect to its orders, rules, and regulations. The Circuit Court of the United States for this district is a court of competent jurisdiction. The domicile of the commission is made by this act in Fulton county, which is in the Northern District of Georgia, and in the division of the district in which this bill has been filed, and it seems to be peculiarly appropriate that the court in which the case is heard is sitting in the county of Fulton.

While the special attorney for the Railroad Commission may not be a necessary party to this suit, he is certainly a proper party. The act of August, 1907, provides that "the office of attorney to the Railroad Commission is hereby created," and his relations to the commission would seem to be such as to at least make him a proper party in a case of this kind.

The secretary of the commission is also, I think, a proper party. If the peculiar relief which is prayed against the secretary can be granted, he would seem to be a necessary party, but the necessity of having the secretary in this litigation is dependent upon the right to this particular relief. In any event, however, he is a proper party to the suit.

It is claimed on behalf of the respondent that as the railroad company has put circular 334 into effect on its road, and as it is actually charging the 2½ cent rate per mile, provided for in the circular, that there is nothing to enjoin. The bill in this case appears to have been filed in the clerk's office on August 30, 1907. This was by the direction of Hon. David D. Shelby, circuit judge, to whom it was presented on that day. The order of Judge Shelby setting the case for hearing in Atlanta on the 16th day of September was made on August 31st. Judge Shelby having declined to grant a temporary restraining order, the 2½-cent rate was put into effect by the railroad company on September 2d, the date named in circular 334 for the new rate to become effective. In the amendment filed October 11, 1907, the complainant says:

"After the bill of complaint was lodged with the court on August 29, 1907, circular 334 went into effect on September 2, 1907, and complainant, being forced thereby solely by the unlawful acts complained of, then put the reduced rates into effect. It desires and intends to restore its rates to their former basis, when and if it should procure the protection of this honorable court, but cannot, by reason of the severe and unconscionable pains and penalties and the multiplicity of suits with which it is threatened, safely do so without such protection."

The first question that would arise in this state of the record is: Should not the complainant's rights in respect to an injunction be considered as of the date the bill was filed, and application made to Judge Shelby for a restraining order? Judge Shelby simply determined that it was a case in which opportunity should be allowed the defendant to be heard before granting the restraining order or injunction pendente lite. The complainant says it filed its bill to avoid putting the rate into effect, and, failing to obtain a restraining order, it submitted to the re-

duced rate in order to avoid the pains and penalties provided in the act. Would not the complainant's rights relate back and be considered as of the date when it sought the aid of the court, if it is shown it is otherwise entitled to the protection of the court through the writ of injunction? More than this, is it not true even now that the new rate is kept in effect by the respondents holding over the complainant the pains and penalties named in the act of the Legislature of August 23, 1907? This seems to be well pleaded, and I see no reason why it is not admitted by the demurrer that it is the purpose of the complainant to charge the three-cent rate, and that it is only prevented from doing so by the threatened penalties named in the act. It would seem a hard rule that would deprive the complainant of relief in a court of equity, to which it would otherwise be entitled, because it submitted to the action of the commission until its rights could be properly passed upon and determined. It should, if it have any effect, rather tend to strengthen the complainant's case. It submitted to the law, although denying that it should be required to do so, and proceeded in a proper way by the presentation of its bill to have the question involved adjudicated by this court. There are many authorities, of course, to the effect that laches and acquiescence will deprive a party of the right to an injunction against a threatened wrong; but in none of them, so far as my examination goes, are the facts like the facts in this case. There has certainly been no laches as to the present hearing. Judge Shelby held that the presentation of the bill at so late a date before circular 334 would go into effect, in connection with other things, justified him in denying a restraining order until a hearing, as suggested. That would not affect the rights of the parties on the present motion. It is perfectly clear that there has been no laches or acquiescence on the part of the complainant company as to the rate order embraced in circular 334. I am satisfied that, if the complainant is entitled to an injunction upon other grounds, there is nothing in the fact that they have put the new rate into effect pending the action of the court to deprive them of the relief prayed.

Complainant next presents the present situation of its business as to earnings, and claims it is not even now receiving a fair return on its investments. It is settled that a railway company is entitled to a fair return on its purely domestic business, without reference to what it is earning on its interstate business, or its business generally. The law on this subject is announced in Smyth v. Ames, which may be gathered from one of the headnotes, giving in condensed form the views on this subject, which are elaborated in the opinion. The following is the headnote:

"The reasonableness or unreasonableness of rates prescribed by a state for the transportation of persons and property wholly within its limits must be determined without reference to the interstate business done by the carrier, or to the profits derived from that business. The state cannot justify unreasonably low rates for domestic transportation, considered alone, upon the ground that the carrier is earning large profits on its interstate business, over which, so far as rates are concerned, the state has no control; nor can the carrier justify unreasonably high rates on domestic business upon the ground that it will be able only in that way to meet losses on its interstate business."

Applying this rule to its present situation, complainant presents the matter by calculations and tables in two phases. It presents the effect upon the capitalization of the company—that is, the aggregate of its stock and of its bonded debt—and then upon what is alleged to be the fair market value of its property. The total capitalization of the company on property operated by it is (stock and bonds) $60,369,988. Five million dollars of this is capital stock, and $15,000,000 income bonds. The aggregate of this, $20,000,000, the complainant leaves out of the calculation for the purpose of arriving at the effect of circular 334. Deducting the $20,000,000, leaves $40,369,988, on which it says the interest charges must be paid to avoid bankruptcy. The entire earnings of the company for the year ending June 30, 1907, was $12,082,877.39, and the entire earnings in Georgia, which are approximately 78 per cent. of the total earnings of the company, was $9,375,516.17. In order to reach the value of that portion of the complainant's bonded debt, and also of its property which is applicable to purely domestic business— that is, that portion of its bonded debt and property on which it is entitled to receive a return upon purely domestic business—the complainant uses the same proportion which its Georgia receipts bear to the entire receipts, and then the proportion which purely domestic receipts bear to its Georgia receipts. The statement in the bill on this subject is as follows:.

"In order to ascertain the return which complainant has received during the last fiscal year ended June 30, 1907, from all of its domestic business in the state of Georgia on the value of complainant's property, which is devoted to all domestic business in Georgia, as between its domestic business and its interstate business. Complainant knows of no better basis of apportionment than by applying the ratio which all domestic earnings in Georgia bear to the total earnings in Georgia, both domestic and interstate. This ratio as previously stated is 50.46 per cent. Complainant alleges that this is a fair and proper basis to employ. The taxes paid in Georgia should also be apportioned as between all domestic business in Georgia and total business, both domestic and interstate, on the same basis."

Seventy-eight per cent. of the total capital using its bonds as a basis is put at $31,323,081. Of this Georgia capitalization 50.46 per cent. is applicable to purely domestic business in Georgia, and this amounts to $15,805,626. Of the gross earnings in Georgia 50.46 per cent. are received from purely domestic business, and amount to $4,731,337.48. The operating expenses on domestic business for the year ending June 30, 1907, were $4,258,203.73. Deducting 50.46 per cent. for Georgia taxes amounting to $152,989.34 leaves $320,144.41, which makes a return for the complainant on that portion of its bonded debt upon which it must pay interest to avoid insolvency 2.025 per cent. This branch of the subject is pursued further by the complainant in its amendment filed October 11th, and it is there alleged that:

"The fixed charges on the entire property of complainant in Georgia, Alabama, and Tennessee, based on the funded debt outstanding June 30, 1907, and rental contracts then in force for lines then operated are shown in the following statement, which does not include interest upon the collateral trust bonds of Central Railroad and Banking Company of Georgia, the mortgage securing which does not rest upon the lines of railway and their appurtenances, to-wit:

Interest on equipment trust obligations.....................$ 143,598 80
Interest on funded debt.................................... 1,475,084 46
Rentals ..................................................  426,809 56
                                                           _____
   Total ............................................$2,045,492 82

"All earnings in the state of Georgia, both domestic and interstate, constitute 77.59 per cent. of the total earnings of the system. It is therefore proper to assign to the state of Georgia 77.59 per cent. of the above total of $2,045,492.82, which is $1,587,097.88. The domestic or intrastate earnings within the state of Georgia constitute 50.46 per cent. of the total earnings in Georgia. It is therefore proper to assign to the domestic earnings in Georgia, freight and passenger, 50.46 per cent. of the above figure, which is $800,849.59.

"It is therefore alleged and averred that the actual annual fixed charges resting upon the property used for domestic business, freight and passenger, within the state of Georgia, omitting (1) interest on collateral trust bonds of Central Railroad & Banking Company, which constitute a lawful and proper portion of the capitalization of the company but interest upon which is contingent upon earnings, interest upon its capital stock, and including only its interest and rental charges which are fixed, absolute and certain, and which must be paid to avoid bankruptcy, are $800,849.59. As shown in article 22 of the original bill, the actual net earnings on domestic business in Georgia for the fiscal year ended June 30, 1907, before deducting taxes, were $473,133.75. Deducting 50.46 per cent. of the Georgia taxes, as above stated, $193,592.71, we have as the net earnings on domestic business in Georgia, after deducting taxes, $279,541.04. It therefore appears that, under existing rates, and before applying the reduction ordered under Circular 334, the Georgia domestic business not only did not earn the actual fixed charges thereon, payment of which is necessary to avoid bankruptcy, but fell short by the sum of $521,308.55."

So, according to the allegation of the bill, the complainant is now receiving from its purely domestic business $521,308.55 less than is sufficient to pay that portion of its interest and rentals applicable to Georgia domestic business; that is, its fixed charges which it is compelled to pay. This omits, as has been stated, $5,000,000 capital stock, and $15,000,000 of income bonds, and embraces only those obligations on which it must pay interest to avoid bankruptcy.

Coming to the value of its property upon which it is entitled to a return, upon its domestic business, the bill makes the following showing: That for the year 1907 its property was returned to the Comptroller General at $18,789.22 per mile. Therefore its return for taxable mileage (1,070.29) was $20,109,917. The Comptroller General rejected this return and assessed the property at $28,000 per mile, aggregating $29,968,120. The Augusta & Savannah Railroad, and a part of the Southwestern Railroad are exempt from taxation in the state of Georgia under irrepealable charters granted by the state. The total mileage of these two railroads which lie in Georgia and are exempt is 252.67 miles. The exempt mileage in Georgia is $4,747,472. It is urged in the original bill that this is very much less than the exempt mileage is worth. It is then stated that complainant operates under lease certain terminal properties in the city of Savannah which are owned by the Ocean Steamship Company of Savannah, and the earnings from which go into the gross earnings of the complainant. This property was returned for taxation in the year 1907 at $409,137, and the return accepted.

The result of this as to taxable and nontaxable property is as follows:

|  | Returned for taxes. | Assessed for taxes. |
|---|---|---|
| Value taxable miles................................ | $20,109,917 | $29,968,120 |
| Value exempt miles................................. | 4,747,472 | 7,074,760 |
| Ocean Steamship Company property................. | 409,137 | 409,137 |
| Total tax value................................ | $25,266,526 | $37,452,017 |

It is stated in the original bill that the difference between the Comptroller General and the complainant had been referred to arbitration as provided by the statutes of the state of Georgia, but no award up to the time of the filing of the original bill had been made. In the amendment filed October 11th the complainant says that the arbitrators since the filing of the original bill assessed the taxable property, including franchises, at $20,859,791.55, which is treated for the purpose of computation in round numbers as $21,000,000. The complainant then alleges in its amendment that the fair market value of 252.67 miles of railway and appurtenances, including franchises thereof, which are exempt from taxation, is greater than the average per mile of the assessed value of the taxable properties of the complainant within the state of Georgia included in the above stated assessment, and this and the Ocean Steamship Company's property together exceed in value the sum of $9,000,000. Therefore the taxable property of the complainant in Georgia being $21,000,000, and the nontaxable property, including the property of the Ocean Steamship Company, $9,000,000, makes an aggregate of $30,000,000. Using the same proportion and applying 50.46 per cent. of this valuation to domestic business, the amount upon which it would be entitled to return on domestic business is $15,138,000. The gross earnings in Georgia from domestic traffic are shown to be $4,731,337.48. Deduct from this the operating expenses, $4,258,203.73, and the taxes which are applicable thereto, $193,592.71, leaves the net earnings on domestic business $279,541.04, which is 1.84 per cent. on the value of property used in domestic business. In bringing down these calculations to a more definite and specific basis, relative to domestic passenger business, two tables are given in the bill, one showing the present return on that proportion of its property applicable to domestic passenger business, and the other showing how the conclusion is reached that the receipts from domestic passenger business are insufficient to pay the fixed charges or the proportion of such fixed charges applicable to domestic passenger business. The tables follow:

### Domestic Passenger Business Only.

| | |
|---|---|
| Fair market value of property used in Georgia, for domestic passenger business (see article 37)............................ | $5,238,000 00 |
| Gross earnings in Georgia from domestic passenger business.... | 1,636,957 19 |
| Minimum operating expenses on same......................... | 1,309,565 75 |
| Maximum net earnings, taxes not deducted.................... | $ 327,391 44 |
| Deduct taxes applicable thereto............................ | 66,986 30 |
| Actual maximum net earnings on domestic passenger business, taxes deducted......................................... | $ 260,405 14 |

Being a return of only 4.97 per cent. on value of property used in Georgia for domestic passenger business.

The gross earnings on Georgia domestic passenger business for 1907 constitute 17.46 per cent. of all of the gross earnings in Georgia. The fixed charges on Georgia business as shown above were $1,587,097.88. It is therefore proper to apply to the domestic passenger business in Georgia, as the fixed charges thereof, 17.46 per cent. of the amount, which is $277,107.29.

As heretofore shown in article 22a of the original bill, the maximum net earnings for the fiscal year 1907 on intrastate passenger business in Georgia, before deducting taxes, were.........$327,391 44

Deduct 17.46 per cent. of Georgia taxes as above.................  66,986 30

Maximum net earnings, Georgia domestic passenger business, taxes deducted ....................................................$260,405 14

It therefore appears that under existing rates, and before applying the reduction ordered under circular 334, the Georgia domestic passenger earnings not only did not earn the fixed charges thereon, payment of which is necessary to avoid bankruptcy, but fell short by the sum of.....................................$ 16,702 15

The return upon that portion of the bonded debt, treated as capital, on which interest must be paid, viz., $40,369,988, which is apportionable to Georgia domestic business, viz., $15,805,626, is 2.025 per cent. The proportion of the interest and rental fixed charge attributable to Georgia domestic business is $800,849.59, as to which there is a deficit of over $500,000. The difference in these two statements will, of course, be accounted for by the proportion of rentals attributed to Georgia business, not embraced in the capitalization feature, and by the excess of interest rate on bonds over 2.025 per cent. The proportion of the capitalization based on bonded debt applicable to Georgia is thirty-one million and odd dollars, and on this complainant's calculations show a return of 2.025 per cent., while on the market value of the property in Georgia, placed at thirty millions, the return is only 1.84 per cent. An examination of the tables in the calculations shows that this is accounted for by the fact that increased taxation for 1907 over 1906 was used in the latter instance, and not in the former.

The complainant claims, and the claim enters into and forms part of the calculation, that the ratio of operating expenses on gross earnings of all its business, both domestic and interstate, is 75.82 per cent., and that the cost of strictly domestic passenger business in Georgia exceeds the cost of all passenger business. The haul of the passengers carried in interstate business is substantially twice as great as in domestic passenger business, and a large part of the domestic passenger business is done on branch lines, and very much the larger part of interstate business is done on the main lines. It is then claimed that the operating ratio of the passenger business in the state of Georgia is greater than the ratio of freight business, and greater than all the complainant's business in the state of Georgia; the operating ratio of all the complainant's business in Georgia being 75.82 per cent. It alleges that the cost of doing all its intrastate business is at least 90 per cent. of its gross earnings from said business. The cost of doing domestic passenger business alone is 80 per cent. The smaller cost and increased return shown on domestic passenger business over all domestic business both freight and passenger is explained in the following:

"Given a difference between the operating ratio of domestic business and the operating ratio of interstate business, the difference between the general operating ratio and the domestic operating ratio will vary inversely as the

proportion of domestic business to all business, both domestic and interstate. In all business within the state of Georgia, both passenger and freight, the domestic business is substantially one-half of the whole, whereas, in the passenger business within the state of Georgia, the domestic business constitutes 74.36 per cent. thereof, the interstate business being very small. Therefore, while the excess of domestic operating ratio over the interstate operating ratio in passenger business is large, its excess over the general operating ratio is smaller than when all business, both passenger and freight, is considered as a whole."

Complainant claims that the effect of circular 334 will be to largely decrease its revenue—that is, in the proportion that $2\frac{1}{2}$ cents bears to 3 cents—and therefore increase the deficit in its fixed-charge obligations, and reduce to practically nothing, the return on the value of its property. Complainant's claim as to its right to a return upon that portion of its property and of its capitalization applicable to domestic business is based on the decision of the Supreme Court in Smyth v. Ames, supra. An extract from the opinion in that case by Mr. Justice Harlan will show what the ruling on that subject is, and what is properly to be taken into consideration in determining whether a rate fixed for it by a Railroad Commission will yield a fair return. It is, as follows:

"We hold, however, that the basis of all calculations as to the reasonableness of rates to be charged by a corporation maintaining a highway under legislative sanction must be the fair value of the property being used by it for the convenience of the public. And, in order to ascertain that value, the original cost of construction, the amount expended in permanent improvements, the amount and market value of its bonds and stock, the present as compared with the original cost of construction, the probable earning capacity of the property under particular rates prescribed by statute, and the sum required to meet operating expenses, are all matters for consideration, and are to be given such weight as may be just and right in each case. We do not say that there may not be other matters to be regarded in estimating the value of the property. What the company is entitled to ask is a fair return upon the value of that which it employs for the public convenience. On the other hand, what the public is entitled to demand is that no more be exacted from it for the use of a public highway than the services rendered by it are reasonably worth."

Testing the present case by the rule thus laid down, has the complainant company been receiving a fair return on its property? The statements in the bill as to capitalization, value of property, and as to respective proportion of earnings seem to be well pleaded, and must be considered as in effect admitted by the demurrer. From the figures given from the bill, it will be seen that on the appraised value of its property in Georgia, taking that part of it applicable to domestic business, the complainant has been receiving a small return, approximately 2 per cent.—that is, from both freight and passenger business—while on its passenger business, considered separately, it has been receiving a return of approximately 5 per cent. While 2 per cent. is a very small return, I do not know that even this rate of itself could, if now under review, be considered as confiscatory and justify judicial action. At least I do not know that it could, as the decisions now stand. Smyth v. Ames, 169 U. S. 544, 546; [1] Covington, etc., v. Sandford, 164 U. S. 578, 17 Sup. Ct. 198, 41 L. Ed. 560. The return on passenger business alone certainly would not. It is less than the legal rate of interest in Geor-

[1] 18 Sup. Ct. 418, 42 L. Ed. 819.

gia, and is less than is usually earned on other capital employed in business in the state, but it can hardly be said to be a "taking" of the railroad company's property. That the rate fixed must be "plainly and palpably unreasonable" is well settled. In San Diego, etc., v. National City, 174 U. S. 739, in the opinion on page 754, 19 Sup. Ct. 804, at page 810 (43 L. Ed. 1154), it is said:

"But it also should be remembered that the judiciary ought not to interfere with the collection of rates established under legislative sanction, unless they are so plainly and palpably unreasonable as to make their enforcement equivalent to the taking of property for public use without such compensation as under all the circumstances is just both to the owner and to the public; that is, judicial interference should never occur unless the case presents, clearly and beyond all doubt, such a flagrant attack upon the rights of property under the guise of regulations as to compel the court to say that the rates prescribed will necessarily have the effect to deny just compensation for private property taken for public use"—citing Chicago & Grand Trunk Railway v. Wellman, 143 U. S. 339, 344, 12 Sup. Ct. 400, 36 L. Ed. 176; Reagan v. Farmers' Loan & Trust Co., 154 U. S. 362, 399, 14 Sup. Ct. 1047, 38 L. Ed. 1014; Smyth v. Ames, 169 U. S. 466, 524, 18 Sup. Ct. 418, 42 L. Ed. 819; Henderson Bridge Co. v. Henderson City, 173 U. S. 592, 615, 19 Sup. Ct. 553, 43 L. Ed. 823.

The failure to realize from its passenger business alone, but in a less proportion, a sufficient amount to pay its interest and fixed charges applicable to Georgia business, is the serious question in the case. The demurrer admits the amount of the fixed charges, and I do not see that any fault can be found with the method by which the complainant reaches that portion of these fixed charges attributable to Georgia business.

This being true, it is admitted that the earnings fell $521,308.55 short of paying the interest on that portion of the 40,000,000-odd dollars of bonded debt applicable to Georgia domestic business, and $16,000 short of paying the interest on that portion of bonded debt applicable to domestic passenger business in Georgia. The amount and market value of the railway company's bonds and stocks is an element to be considered under the decisions of the Supreme Court in determining the reasonableness of a particular rate established by a Railroad Commission. If a railway company is earning less from its existing rates than will pay the proper proportion which its domestic business should bear of its subsisting and legal fixed charges, any attempt to reduce the rates in such way as that the company will sustain still further loss of revenue would seem to be violative of its constitutional rights and entitle it to relief. In Railway Company v. Tompkins, 176 U. S. 167, 172, 20 Sup. Ct. 336, page 338 (44 L. Ed. 417), in the opinion by Mr. Justice Brewer, it is said:

"When we recall that, as estimated, over ten thousand million of dollars are invested in railroad property, the proposition that such a vast amount of property is beyond the protecting clauses of the Constitution, that the owners may be deprived of it by the arbitrary enactment of any Legislature, state or nation, without right of appeal to the courts, is one which cannot for a moment be tolerated. Difficult as are the questions involved in these cases, burdensome as the labor is which they cast upon the courts, no tribunal can hesitate to respond to the duty of inquiry and protection cast upon it by the Constitution. Railroad Commission Cases, 116 U. S. 307, 6 Sup. Ct. 334, 388, 1191, 29 L. Ed. 636; Dow v. Beidelman, 125 U. S. 680, 8 Sup. Ct. 1028, 31 L. Ed. 841; Georgia Railroad & Banking Company v. Smith, 128 U. S. 174, 9 Sup.

Ct. 47, 32 L. Ed. 377; Chicago, Milwaukee & St. Paul Railway Company v. Minnesota, 134 U. S. 418, 10 Sup. Ct. 462, 33 L. Ed. 970; Chicago & Grand Trunk Railway v. Wellman, 143 U. S. 339, 12 Sup. Ct. 400, 36 L. Ed. 176; Reagan v. Farmers' Loan & Trust Co., 154 U. S. 362, 14 Sup. Ct. 1047, 38 L. Ed. 1014; St. Louis & San Francisco Railway v. Gill, 156 U. S. 649, 15 Sup. Ct. 484, 39 L. Ed. 567; Covington, etc., Turnpike Co. v. Sandford, 164 U. S. 578, 17 Sup. Ct. 198, 41 L. Ed. 560; Smyth v. Ames, 169 U. S. 466, 18 Sup. Ct. 418, 42 L. Ed. 819."

If there was any dispute as to the amount of the company's interest and rental charge, or any issue as to the legality of the same, a different question would be presented. But by the demurrer in this case it is admitted that the complainant company has these legal obligations and there is an actual deficit in paying the same as to its domestic business.

The foregoing brings the matter down to the other important, and for the present controlling, question in the case, namely, whether the complainant will sustain any loss in revenue by reason of the decreased passenger rate on its domestic business. It is alleged in the bill that this loss will be approximately $300,000. A table is given showing the actual earnings, and the estimated earnings by reason of this circular. There would seem to be a very great difference between the effect of a reduction in passenger rates and in freight rates. In the case of reduction in passenger rates, the decreased rate might stimulate travel, and increase it to such an extent as to overcome the difference in rate, whereas the same amount of freight would probably move under any reasonable rate. The court is asked to assume that the reduction in rate would necessarily bring about a reduction in revenue. In the case of Railroad Company v. Wellman, 143 U. S. 339, 12 Sup. Ct. 400, 36 L. Ed. 176, it is said in the opinion by Mr. Justice Brewer on this subject:

"Must it be declared as a matter of law that a reduction of rates necessarily diminishes income? May it not be possible—indeed, does not all experience suggest the probability—that a reduction of rates will increase the amount of business, and therefore the earnings?"

This language was quoted with approval in Railway Company v. Gill, 156 U. S. 649, 15 Sup. Ct. 484, 39 L. Ed. 567.

While it is true that this case was heard on demurrer, and the right of the parties would therefore depend on the sufficiency of the bill, still having in view the question just suggested, as to the right of either the complainant or the court to assume a loss of revenue as the result of the reduced passenger rates, the counsel for the complainant were requested to furnish the court with certain information to be used in determining complainant's right to an injunction pendente lite. Circular 334 went into effect on September 2d, and the argument on the motion for injunction was concluded on October 11th, so the counsel were requested to furnish the court with a statement of the company's receipts from passenger business in Georgia for the month of September, 1907, and for comparison a statement of its receipts for the preceding month of August; also, its receipts for the month of September, 1906. This statement has been furnished. It shows that the earnings for September, 1906, were $244,509.02, while the earnings for

September, 1907, were $253,641.96, showing an increase of $9,132.94. The statement does not give the earnings for August, 1907, but gives the earnings for eight months of 1906 and 1907, ending August 31st of each year, which would seem to indicate that the proportionate increase was greater prior to September 1st than during that month. For Georgia domestic trains only there was only a slight increase in September, 1907, over September, 1906, of $57.51. It is claimed in a memorandum attached to the statement furnished by the railway company that the increase in earnings for September, 1907, over September, 1906, was less than the increase for 1906 over 1905, 1905 over 1904, and 1904 over 1903. This may or may not show that the decreased rate is resulting in a loss to the company. I agree with what is said by the complainant's counsel in a letter accompanying this statement that one month's business is hardly a fair test either way. My judgment is, after careful reflection, that the railway company should try the new rate for a few months, and see what the effect is on its passenger business. If the result should be a substantial loss in receipts from passenger business, it would be entitled to an injunction pending the consideration and final determination of this case, and in this event the decree can make proper provision for the protection of the traveling public, and for any loss sustained by passengers in the event the final decree should be adverse to the railway company. If, after testing this new rate for a few months, it should appear that no loss has resulted, then complainant would not be entitled to an injunction pendente lite. For the reasons that have already been given, I do not believe that the allegation that loss will result to the railway company from the new rate is such a well-pleaded statement of fact as that it is admitted to be true by the demurrer. In the Reagan Case, 154 U. S. 401, 14 Sup. Ct. 1056 (38 L. Ed. 1014), in discussing this matter of how far a demurrer will admit allegations such as this to be true as a matter of fact, it is said:

"It would not, of course, be tolerable for a court administering equity to seize upon a technicality for the purpose or with the result of entrapping either of the parties before it. Hence we should hesitate to take the filing of the demurrers to these bills as a direct and explicit admission on the part of the defendants that the rates established by the commission are unjust and unreasonable. Yet it must be noticed that at first answers were filed, tendering issue upon the matters of fact, and testimony was taken, the extent of which, however, is not disclosed by the record. After that the defendants applied for leave to withdraw their answers and file demurrers. It is not to be supposed that this was done thoughtlessly. But one conclusion can be drawn from that action, and that is that upon the taking of their testimony defendants became satisfied that the particular facts were as stated in the bills, and that the conclusions to be drawn from such facts could not be overthrown by any other matters."

It is further shown in the Reagan Case, as stated in the opinion (page 411 of 154 U. S., page 1059 of 14 Sup. Ct. [38 L. Ed. 1014]), that:

"The actual reduction by virtue of this tariff in the receipts during the six or eight months that it has been enforced amounts to over $150,000."

In both the Reagan Case and in the case of Smyth v. Ames, there was quite a large reduction in the general tariff of rates, both of

157 F.—62

freight and fares. In the Smyth v. Ames Case, the reduction in the general tariff of rates was 29½ per cent. These two cases, as is well understood, are the leading cases upon questions like those now before this court.

I have given the matter of the proper direction to be given this case earnest and very thorough consideration. It is not a light thing to interfere with the agencies created by the state for the administration of such important matters as the Railroad Commission of Georgia is charged with under the statutes of the state. Nor should the claim that rights of property have been seriously invaded be lightly treated. The right of the complainant to come into the courts of the United States with a case like this when it claims that the effect of rates fixed by the Railroad Commission is to take its property without just compensation, without due process of law, and to deny it the equal protection of the law under the fifth and fourteenth amendments, is as well settled by repeated decisions of the Supreme Court as anything well could be.

Complainant's counsel earnestly claim that while this investigation is going on, and during any delay to ascertain the effect of this circular, the company is sustaining serious loss. But that goes to the whole question at issue. If that were shown satisfactorily, the temporary injunction should issue; but it is not. All that can be said as to this, taking the most favorable view of the allegations in the bill, is that the railway company's officers, in good faith, believe the company will suffer serious loss. This surely is insufficient. It is not easy to say how long this rate should be tried to ascertain its effect upon the railway company's business. Six months from the time the rate became operative should certainly demonstrate what its effect will be. My conclusion is it would be best that the company should continue the rate in effect for that length of time, and ascertain the result. After it shall have been tried for this length of time, the court will determine the right to an injunction. However, after the returns for complainant's passenger business up to January 1st are available, and can be put in shape, if complainant's counsel desire they may then furnish to the court a sworn statement of the company's officers, and, if they wish to do so, compare the same with the four immediately preceding months, and, further, with the same four months of the preceding year —that is, from September 1, 1906, to January 1, 1907—the court will then take under advisement again the question of issuing a temporary injunction. In the meantime the court will withhold action, and neither deny nor grant the injunction.

In pursuance to what has been said, an order may be taken denying the application to make the Governor a party defendant. At the proper time an order may be taken sustaining so much of the demurrer as raises the question as to the Attorney General being a proper party. The motion to make the secretary of the commission a party is granted and the amendment to that effect allowed. The demurrer otherwise than has been stated is on this hearing for temporary injunction deemed insufficient, and will, at the proper time, be overruled, except as to the Attorney General, and in so far as what has been said above treats the allegation as to loss of revenue from circular 334 as insufficient.